106 So.2d 665

**Carson DICKEY, d/b/a Alabama Red Ash Coal Co.**

v.

**Melvin E. HONEYCUTT et al.**

**7 Div. 467.**

Court of Appeals of Alabama.

Aug. 19, 1958.

Rehearing Denied Oct. 7, 1958.

Lipscomb, Brobston, Jones & Brobston, Bessemer, for appellees.

Burr, McKamy, Moore & Thomas and J. R. Forman, Jr., Birmingham, for appellant.

PRICE, Judge.

This is an appeal from a judgment in the sum of $625 in favor of appellee for alleged damage to a water well.

The complaint originally consisted of four counts. The court, at defendant's request, gave to the jury the affirmative charge as to counts one and two. The case was submitted to the jury on counts three and four.

Appellant urges the insufficiency of the evidence either to warrant submission of the case to the jury or to support the jury's verdict.

Plaintiffs own two acres of land in Shelby County on which there is located a four-room house, an assortment of fruit trees and a bored well 6 inches in diameter and 58 feet deep. The well was on the property when plaintiffs purchased the same in April, 1954. About the first of July, 1955, plaintiffs installed a deep well jet type pump. At that time the water stood 25 to 30 feet in the well and the pipe attached to the pump was put within four feet of the bottom of the well. Between the 10th and 15th of November, 1955, the plaintiffs discovered the well was completely dry. Subsequent to November, 1955, plaintiffs had checked the well. On the day of the trial it contained a little over 3 feet of water. The largest volume of water that had been in the well since it went dry was 11 feet during the heavy winter rain; that shortly after a rain the water level would fall off pretty fast. The water that came back in the well was full of minerals, heavy, and had a definite odor and was unfit for domestic use. Prior to this occasion there had been no water failure in the well, although the level of the water would drop several feet below normal during the dry summer months. There were two other wells on the little knoll where he lived, one belonging to his father and one to his brother, but plaintiffs' was the only well that went dry. Each of the wells had different types of water.

Mr. Melvin Honeycutt testified the reasonable cash market value of his property before the alleged damage to his well was about $2,500 and after the damage it was $1,000. On cross-examination he testified this was the only purchase of real estate he had ever made; that he bought the property in 1954 for $2,000; that at the time of trial he was in process of constructing two more rooms to the house. Prior to installing the pump there was plenty of water in the well; that a bucket three or four feet long holding ten quarts of water, was used to draw the water. He stated he didn't know how much water the electric pump would pump per hour, nor had he ever run it long enough to see how long it would take to pump the well dry.

Plaintiffs' Exhibit "A," a map furnished to plaintiffs by the defendant, and which, it was agreed, correctly indicated the underground workings of the mine in question, the location of plaintiffs' well and property on the surface and Mr. Aubry Honeycutt's well, was introduced in evidence.

The map, which is before us, indicates that third and fourth left headings, tunnels from which coal has been removed, extended closer to plaintiffs' property than any other portion of the mine, and came within a short distance of the section line, beneath the surface, which forms the south boundary of plaintiffs' surface property.

It was stipulated that the dates on the map at the face of each heading indicate when the mining operations were abandoned in that particular area; that the progress of the mining had been in succession, that is, after the end of third left heading was reached mining started in the fourth, then on into fifth and sixth; that the map indicates that on November 15, 1955, mining was being conducted in sixth left heading and air course. The map shows that third and fourth left headings were abandoned in January, 1952, and August, 1953, respectively. According to the map the headings varied in length from 1,400 to 1,500 feet at third and fourth to 1,700 feet at sixth.

On Saturday preceding the trial an inspection party, including Melvin Honeycutt and defendant, Mr. Dickey, and several other persons who testified on the trial, went into the mine to observe the operations of defendant.

The testimony was to the effect that the method of operation in "third left" was to take all the coal for a width of 60 feet, leave a pillar of coal and then take all the coal for another 60-foot width. One of these openings was the heading and the other was the air course. The roof was supported with wooden timbers and the pillars of coal between the two tunnels.

The same method of operation was followed in "fourth left," except there were three tunnels simultaneously developed separated by pillars of coal. The testimony of plaintiffs' witnesses tended to show that the pillars of coal left in third and fourth headings for roof support ranged in width from 5 to 15 feet, while the testimony of defendant's witnesses tended to show that the pillars were all 20 x 30 feet and that no pillar was narrowed to 5 feet. One of plaintiffs' witnesses testified that good mining practices require that at least 40 per cent of the coal be left as pillars for support and not more than 15 or 20 per cent of the coal · was left as pillars here; and the small coal pillars were not enough support for the roof; that the importance of supporting the roof is to "prevent cracks on the surface destroying water or damage to the surface otherwise."

We think the testimony is undisputed that in underground mining wooden timbers are used only to support the immediate roof while the men are working, but that the major top can only be controlled by some permanent means, such as leaving a sufficient amount of coal as pillars to support it; that when a heading is abandoned the wooden timbers will soon rot. There was evidence that the timbers in third and fourth headings had rotted and no longer supported the roof. .

The members of the inspection party testifying for plaintiff stated that they were stopped by rock falls in third and fourth headings; that they then came back to the slope and proceeded up fifth until they encountered a rock fall, but they had gone around this fall by going through a cross cut into sixth without going back to the slope, and proceeded as far as the tunnel went. Plaintiff, Melvin Honeycutt, testified they had to go 250 or 300 feet in sixth heading to get around the rock fall in fifth. One witness classified the falls in third and fourth as major falls and stated he observed quite a bit of water, "pretty good size little stream" right at the fall. However, there is confusion in the record as to whether or not the witness was talking about a fall or fault with reference to the source of water.

A fault in a coal mine was explained by a witness as a "separation between the main roof, a step-up or step-down," the coal is displaced. The displacement in the

faults in Mr. Dickey's mine was "around two feet in the first fault and apparently was a little larger in the second fault, maybe three feet." Each fault was a step-up and the fault applied to the strata directly above the coal as well as to the coal seam itself. "Where the faults are spaced at a reasonable distance apart and there is a complete separation the loose ends to that particular rock are more apt to drop down because it doesn't have to have the pressure to break this rock which had been broken by the fault." When a fall occurs involving a fault the crack in the roof tends to follow the angle of the fault; that he would judge the pitch of the faults to be 70 degrees or 80 degrees going up toward the surface. This witness testified that on the inspection visit he noticed the first fault in third was standing, he didn't go to the second fault in third; that the first fault in sixth was tight, and he saw no water coming out of that fault; that at the second fault in sixth water was coming along the floor but he saw none coming from the roof of the fault; that he didn't go into first or fifth headings.

For the defendant, Mr. Anthony, mine foreman from May, 1955, to February, 1956, testified he was underground all day every day; that he made fire boss rounds every morning in all the places where the men were working and made a full works inspection every other week; that there were no falls in fifth during the time he was employed; that there was a fall in third left when he went to work in May, which was approximately half-way of the heading, beyond the first fault and 1,000 or 1,200 feet from the entrance, from the slope; that there was a fall about 100 feet beyond the fault in third but no fall at the fault itself; that there was a fall in fourth not over 15 or 20 feet beyond the first fault, which fell back toward the heading. On cross-examination he stated he could go in third about 1,000 feet and not quite so far in fourth; that when timbers are left standing two or three years and begin to rot falls could be expected; that sometimes it is necessary to cause a roof to fall in one place to relieve pressure in another place.

Defendant's mine superintendent for six years testified long wall method of mining was first tried but it wouldn't work; that since about May, 1951, the method has been to narrow the size of the faces to 50 feet and turn cross cut every 30 feet on the pillars, which are all 30 x 20 feet; that he would not call the little off-sets or step-ups faults; that there is no open space or crack in the rock at these step-ups and there was no water around these places; that no water coming from the roof or fault had ever flooded the mine; that the only excess water in the mine was from a bore hole drilled in 1956, which goes from the surface, a depth of 577 feet down to the extreme bottom of the mine; that about December, 1951, a hole was bored in third to bring electric power to the mine; that a little stream of water came through this hole, but nothing like the water that came in with the other bore hole; that water draining into the mine was pumped to the surface and used to wash coal; that prior to boring the hole in 1956 water for the coal washer was taken from the Milam mine, an abandoned operation 800 feet above defendant's mine, in another seam of coal; that the entries from the Milam mine extend over the Dickey mine; that it is good mining practice to allow the roof to come down on a room so it will arch and that practice is followed in Mr. Dickey's mine; that no pillar in defendant's mine has collapsed from weight and timbers have never been blown or pulled down from any section of the roof to allow it to collapse immediately. On cross-examination witness stated he went in the mine with the inspection party; that the falls in third and fourth were no bigger than the fall in fifth; that the approximate distance from the tunnel made through the outcrop of coal seam to get water from the Milam mine was about 1,200 feet from plaintiffs' well; that a roof fall over the full area of 60 x 1,400 feet was never permitted; that thicker, heavier pillars were left between fourth and fifth headings and

the air courses and headings narrowed to 50 feet and the general plan of mining changed in that area because the coal is soft and would not lump.

Defendant's testimony was substantially the same as that of his foreman and superintendent. He stated the only excess water in the mine is through the hole bored below eighth level in January, 1956; that in drilling the hole a stream of water was struck 80 feet from the surface; that water couldn't be lowered in the hole by pumping at 50 gallons per minute; that that point is over the crest of the mountain from his mine; that the mouth of the Milam mine is halfway up the mountain from his mine and the Milam seam outcrops up the mountain higher than plaintiffs' house; that it is good mining practice to allow the roof to fall in local places so that it arches over and supports the roof from then on out; that there is no place in his mine where he deliberately allowed the collapse of pillars; that the faults were not open cracks but were as tight as any other part of the roof and no water had come in any of them; that he had measured plaintiffs' well on numerous occasions, first in November, 1955 when he found it dry; on April 21, 1956, it contained 9 feet 10½ inches of water; on June 30, 1956, 3 feet 9 inches; on August 11 and 13, 1956, when it contained 5 feet 3 inches.

Mr. Themonge testified the mine was just behind his house; that he had two wells, a dug well 16 feet deep and a bored well 40 feet deep; that during the 26 years he had lived there rainfall or lack of rainfall affected the dug well; that during drouths, usually August and September, it goes dry; that a well between his house and Aubry Honeycutt's was first put in around 1949 to a depth of 50 feet; that it went dry in 1950 but after it was deepened to 125 feet the water came back to within 50 feet of the surface; six months prior to trial it still had water in it; that he has never had any trouble with his 40-foot well in summer; that all bored wells have mineral water because they go through coal.

Mr. Youngblood, a State mine inspector, testified he last inspected the Dickey mine in December, 1955; that the practices followed by defendant in his coal field were those generally accepted as good mining practices. On cross-examination he stated that when he last inspected the mine he only went in fifth heading; that he measured fifth heading to the face, a distance of 1,700 feet; that he did not know which heading was closest to plaintiffs' well; that third and fourth headings were caved in at that time and he couldn't crawl in there; that in his opinion the heavy pillars separating fourth and fifth left, and narrowing the entries from 60 to 50 feet were purely company policy; that such practices might possibly but not necessarily relieve the pressure on five and six; that he found no water at the caved-in areas in third and fourth.

Dr. Walter B. Jones, State Geologist for 33 years, testified his duties encompass "the study of rocks, formations, minerals and other materials that can be made of value to the people, including water;" that for the past 10 years his major effort has been water, because the water table has been going down because of drouth; that he is familiar with the Cahaba field formation and has had experience in examining those stratas; that he measured the water in plaintiffs' well the previous Monday, finding it to be 4 feet 9 inches; that plaintiffs' well and those of C. D. and Aubry Honeycutt were in a formation called coal measures, which is the name given to an assembly of shales and sandstone which carry coal beds and vary in thickness; that the materials which make up these measures have different water bearing capacity; that shales carry no water and in this vicinity there was much more shale than sandstone; that the sandstone is fine grained and doesn't hold much water as it becomes quickly saturated; that it gives good water but not a large

quantity; that the water gets into the sandstone from the outcrop which is on the face of the hill below and behind the house and toward the Cahaba River; that the formation dips to the southeast toward the mountain plaintiffs' house faces; that the only source of water for plaintiffs' well is rainwater falling on the slope and as it runs down the hill some of it gets in this sandstone bed and if it is pumped out of those formations it could dry them up just as a bath tub can be emptied, and the water would come back in the formation only with the next rain; that from his examination of the wells there and his knowledge of the geological formations it was his opinion the mine has not in any manner affected or influenced plaintiffs' well. On cross-examination he stated that if the sandstone strata plaintiffs' well is in is followed around the hill in the general direction toward the Dickey mine the strata outcrop is just above the mine and slightly overlaps Mr. Dickey's seam of coal.

■ In Sloss-Sheffield Steel & Iron Company v. Wilkes, 231 Ala. 511, 165 So. 764, 770, 109 A.L.R. 385, the rule of law here applicable was declared to be as follows:

"If defendant is conducting any sort of operations to which its land is adapted in an ordinary and careful manner, and as a consequence percolating water is drained, affecting the surface owner's water supply, either of that or adjoining land, no liability for his damage exists. But if the waters are drained without a reasonable need to do so, or are willfully or negligently wasted in such operation in a way and manner as that it should have been anticipated to occur, and as a proximate result the damage accrued to the surface owners so affected, including adjoining landowners, there is an actionable claim."

See also second appeal Wilkes case, supra, 236 Ala. 173, 181 So. 276.

■ Without analyzing what we believe are the points of difference in the facts in the Wilkes case, supra, and the evi-dence here, we are of opinion the evidence, together with the inferences reasonably to be drawn therefrom, presented questions for the jury as to whether or not defendant failed to exercise due care in his mining operations, under the rule laid down in the Wilkes case, supra, and whether or not plaintiffs' well was damaged as the proximate result of defendant's negligence. The general affirmative charge was properly refused.

■ We cannot say the verdict was so contrary to the great weight of the evidence as to put the trial court in error for refusing the motion for a new trial. Cobb v. Malone, 92 Ala. 630, 9 So. 738.

■ True, the expert testimony of Dr. Jones was to the effect that the well was not affected by the mine, however, such expert testimony is not conclusive on the jury and they are not necessarily bound by it. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; Smith v. Smith, 254 Ala. 404, 48 So.2d 546.

■■ We find no merit in defendant's insistence that a variance between the allegations of the complaint that defendant negligently mined or removed pillars of coal or other materials from beneath the surface of plaintiffs' land and the proof which showed that plaintiffs were adjoining landowners, entitled him to the general affirmative charge. No assignment of error raises this question. Furthermore, in Republic Steel Corporation v. Stracner, 246 Ala. 620, 21 So.2d 690, 692, the court said: "The rule of liability regarding injury to wells fed by such subterranean waters is the same as to superjacent and adjoining landowners, where there is no subsidence or other injury to the surface soil; viz, liability for failure to exercise due care in the reasonable use of his land."

The judgment is affirmed.

Affirmed.