200 So.2d 506

**Gene Robert ISON**

v.

**STATE.**

3 Div. 201.

Court of Appeals of Alabama.

Aug. 16, 1966.

Rehearing Denied Sept. 19, 1966.

Affirmed on Mandate June 13, 1967.

1. 43 Ala.App. 442.

2. Post p. 12.

Ralph Smith and John Patterson, Montgomery, for appellant.

Richmond M. Flowers, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted May 12, 1966.

From a voluntary manslaughter conviction on a jury verdict, Ison appeals from the resulting judgment of the Montgomery Circuit Court. The jury fixed his punishment at eight years in the penitentiary.

## I.

On the night of Sunday, August 30, 1964, Henry Hall was leaving Don's 500 Club on the Lower Wetumpka Road near Boylston in Montgomery County. He was a passenger in the car of Mr. Albert Thompson.

As the car was pulling away Mr. Ison, the defendant, flagged it down. He came up to the car on the right side.

The State's version of the ensuing tragedy as told by Mr. Thompson on direct was:

"A   He walked up to the car.

"Q   On which side?

"A   On the right hand side where the boy was sitting. He told him he was tired of drunks parking over here and raising hell by coming out of the club drunk, and the boy said that we were just leaving, we hadn't done anything. And he started rolling up the window of the car. The guy had a gun and when he saw the gun he started rolling the window up. And he told him, he said, 'Boy, you better not roll that window up while I am talking to you.' So he quit. They had some more words. I don't re-

member exactly what that was. The boy reached down to start to roll the window up again and turned and may have said something, and he told the boy, 'I told you, boy, not to roll that window up', and he shot him."

Mr. Ison testified:

"A Well, they cranked up and they started to pull up and I walked up there out in the street and hollered, I said, 'I want to talk to you all a minute.' I was going to tell them about all the trouble I had the following morning. So they pulled up there and stopped and I walked up there and he rolled the window down and he said, 'what the hell do you want?' I said, 'I want to tell you about the trouble I have been having out there, and I sure would appreciate it if you all park.' I had my arm laying up on the glass.

"Q On the window of the car?

"A Yes, sir.

"Q Which side of the car?

"A On the right hand side of the car.

"Q All right. Go ahead.

"A And then they started, and he said, 'who in the hell are you?' And I seen there wasn't going to be—they started making moves, and his glass started coming up and I snatched my arm out of the window and the gun went off.

"Q How did the gun fire, Gene?

"A I wouldn't know. I guess when I pulled my hand out of the glass there.

"Q How far had he gotten the glass rolled up at the time you pulled your hand through the opening?

"A I had my arm laying there and when I snatched it, it snatched my arm down the glass and it went off, and I turned and walked on in the house.

"Q Did you squeeze the trigger on the gun?

"A Not as I know of, no, sir.

"Q Did the gun fire accidentally?

"A Yes, sir.

"Q Is that the truth now, Gene?

"A Yes, sir.

"Q So help you God?

"A Yes, sir. When I snatched my arm out the gun went off."

Mr. M. E. Bailey, a member of the Montgomery Police Department, was examined outside the presence of the jury. We extract in part:

"Q Did the Defendant make a statement to you?

"A Yes, sir, he did.

"Q Did you offer him any reward or hope of reward?

"A No, sir, I didn't.

"Q Did you make any threats or intimidate him in any way?

"A No, sir, I didn't.

"Q Was the statement he made free and voluntary?

"A Yes, sir, it was.

"BY THE COURT:

"Q Did you ask him if he wanted to make a statement?

"A No, sir, I did not.

"BY MR. CROSLAND:

"Q Was the statement volunteered by him?

"A Yes, sir, it was.

"Q You didn't ask him if he had anything to say how it happened, or ask him how it happened?

"A No, sir, I didn't.

"Q Tell us exactly what he did when he came out of the house, I believe is where you were cut off.

"A He walked up to the edge of the street there. He was still in his yard, and I asked him did he do it, and he said, 'yes, I shot him.' He said, 'something had to be done and I shot him.' At that time he gave me the gun.

"MR. CROSLAND: That's all.

"THE COURT: Any questions?

"MR. SMITH: Not at this time, no. We will question the statement at the trial.

"THE COURT: The Court will hold it was voluntary."

It is to be noted that the predicate for voluntariness lies solely in the second and third questions and their answers above quoted. Neither question asks about the actions or words of any other person present besides Messrs. Ison and McKenzie.

We extend this enquiry to the questioning after the trial was resumed before the jury. Again we quote in part:

"Q You were on the stand previously this morning; is that correct?

"A Yes, sir.

"Q Now, I believe you testified up to the time you were stopped you had gotten back to the scene and Mr. Ison, the Defendant, was coming from his house; is that correct?

"A Yes, sir.

"Q Now, did Mr. Ison make any statement to you at that time?

"A Yes, sir, he did, when I asked him a question.

"Q What did he say, just tell what happened between you and the defendant.

"A He walked up to the edge of the road still in his yard. I asked him if he shot the person. He said, 'yes, I did, something had to be done and I have done it.' And at that time he gave me the pistol he had in his hand.

"Q Now, that was how long after the shooting had taken place he came out and said that?

"A Only been three or four minutes at the most.

"Q Was that right after *you all* had gotten to the scene?

"A Yes, sir, it was.

"Q Did you see him leaving the scene?

"A No, sir, I didn't.

"Q When you got up there, where was he, do you know?

"A The first time I seen him he opened the door to his house and walked outside.

"Q He was in the house?

"A Yes, sir, he was.

"Q He walked out?

"A Yes, sir.

"Q And came toward you?

"A Yes, sir.

"Q And that is when he said he did it and handed you the pistol?

"A Yes, sir, he did.

"Q Did he tell you that was the pistol that he used?

"A Yes, sir." (Italics added.)

## II.

In Stewart v. State, 231 Ala. 594, 165 So. 840, we find this general rule:

"The predicate for the admission in evidence of the defendant's confession was not sufficient, in that it did not show that it was not brought about by threats or abuse made or inflicted by others than the witness Powell, or by reward or the hope thereof so offered or held out by persons other than the witness. Confessions are presumed to be involuntary, and the burden was on the state to show

that the confession was voluntary. Jackson v. State, 226 Ala. 72, 145 So. 656; Bates v. State, 222 Ala. 688, 133 So. 914."

We cannot apply the harmless error rule to the reception of this incriminating statement of the defendant. This because its omission to claim that the shooting was an unavoidable accident admits of an inference of guilt under the principle of damnifying silence when there is a duty to deny.

Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, will not apply to a retrial as it might under Gibson v. United States (5th Cir.), 363 F.2d 146, because the defendant was not in custody when he made the inculpatory statement.

### III.

The question of setting a capital case for trial where arraignment precedes by several months the service of the special venire appears unlikely to arise again. Corbbett v. State, 265 Ala. 394, 91 So.2d 509.

The judgment below is

Reversed and remanded.

### After Remandment

CATES, Judge.

In Part III of our former opinion, we glossed over the appellant's claim of error because the trial judge denied a motion to quash the venire.

We shall set out, in chronological sequence, the background for this contention:

1. February 16, 1965—minute entry (R. 2) shows arraignment with counsel and entry of pleas of not guilty and not guilty by reason of insanity with an order for summoning regular and special venire (Code 1940, T. 30, § 63), and setting trial of the indictment for March 1.

2. March 1—minute entry (R. 2) on motion of appellant continuing cause to "next term" of court.

3. May 18—minute entry (R. 3) shows appellant and counsel in court:

"* * * and the said defendant having heretofore been duly arraigned and charged upon the indictment, pleaded thereto not guilty and not guilty by reason of insanity. And on motion of the Solicitor for the State, it is considered and ordered by the Court that the 31st day of May, 1965, be and the same is hereby appointed as the date for the trial of this cause.

"It is further considered and ordered by the Court that the Sheriff of Montgomery County summon ONE HUNDRED jurors, including those heretofore drawn on the regular venire for the week in which this cause is set for trial; the Court proceeds to draw from the jury box in open Court and in the presence of the defendant, the number of names, to-wit: THIRTY-FIVE persons with the regular jurors, heretofore drawn for the week in which this cause is set for trial, to-wit: SIXTY-FIVE, making the ONE HUNDRED jurors named in this order.

"It is further ordered by the Court that a list of all jurors drawn for the week in which this cause is set for trial and those that are hereby specially drawn, be forthwith served upon the defendant by the Sheriff of this County, a copy of the indictment having already been served upon the defendant."

4. June 2—on motion of appellant, the court quashed the venire ordered May 18 to try defendant, because the sheriff had not personally served appellant with the venire lists and a copy of the indictment "at least one entire day before the day set for trial"; § 63, supra.

5. June 2—cause again continued until the "next term" of court.

6. July 20—minute entry which is verbatim that in 3 above, except a) trial set for August 2, 1965; and b) total number of veniremen set at 85, i. e., 25 and 60.

7. August 2—the motion to quash and order of denial of instant concern appears (R. 6):

The appellant's proposition of law appears to be taken from headnote 8 of Barnett v. State, 28 Ala.App. 293, 184 So. 702. It reads:

"In a prosecution for murder in the first degree where the defendant has pleaded not guilty, the trial court must set a day

"Comes the defendant in the above styled cause and moves the Court to quash the venire heretofore summoned for August 2, 1965, and for grounds of said cause assigns the following:

"1. For that the cause was not set for trial by the Court on August 2, 1965, as required by law."

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

"MONDAY, AUGUST 2, 1965
COURT MET PURSUANT TO ADJOURNMENT
PRESENT THE HONORABLE RICHARD P. EMMET, JUDGE PRESIDING

"THE STATE
# 1948 VS          OFFENSE — MURDER, FIRST DEGREE
GENE ROBERT ISON alias

"The motion to quash the venire coming on to be heard, and after hearing the evidence, the Court is of opinion that said motion should be denied.

"It is therefore considered and ordered by the Court that the Motion to quash the venire heretofore drawn for the trial of this cause on August 2, 1965, be and the same is hereby denied."

for the trial of the cause in the presence of the defendant."

█ On direct appeal, the appellant must take the record as the clerk certifies it for the appellant to present it to the appellate court. The acts collated in Michie's 1958 Code, T. 7, § 827(1a), operate only on that part of the record transcribed by the court reporter.

█ Should the appellant think that a minute (or judgment) entry does not speak the truth, he has generally two remedies, both collateral. Before submission of the appeal, he can bring an independent separate civil action to amend nunc pro tunc.

This is statutory. Code 1940, T. 7, §§ 566 and 567. Ex parte Hutchinson, 264 Ala. 447, 87 So.2d 847.

█ Secondly, coram nobis is available after appeal. See Brown v. State, 250 Ala. 444, 35 So.2d 518. Its scope mainly extends to matters of fact (not previously adjudicated) which, if known to the court, would have prevented judgment, provided that the defendant has been diligent in asserting his known or ascertainable rights. In particular, this writ affords a remedy to determine whether or not the facts adduced clearly and convincingly overcome the *praesumptio juristantum* [1] of "absolute

1. See Johnson, J., in McCreary v. State, 42 Ala.App. 410, 166 So.2d 914: "Presumptions are of three sorts: (1) Conclusive (i. e., irrebuttable) *praesumptiones juris* and *de jure*, unassailable by force of law, Baxter v. State, 41 Ala.App. 533, 143 So.2d 191: (2) inconclusive (i. e., rebuttable) *praesumptiones juristantum* which stand by force of law as true until disproved; and (3) factual (i. e., legally unaided) *praesumptiones hominis vel facti*, e. g., possession is a strong presumption of fact."

**12**

verity" which cloaks the judgment of a court of record. Howard v. State, 280 Ala. 430, 194 So.2d 834. Compare Holford v. Alexander, 12 Ala. 280, 46 Am.Dec. 253.

■ Here the appellant sought to expunge by a motion to correct the bench note from which the clerk composed the July 20 order referred to in 6 above. This is not within the scope of §§ 566 and 567, supra. Hence this latter motion was correctly denied.

On authority of Ison v. State, 281 Ala. 189, 200 So.2d 511 (May 5, 1967), the judgment below is

Affirmed.

JOHNSON, J., not sitting.