229 So.2d 524

**COALITE, INC.**

v.

**Leethel ALDRIDGE et ux.**

**6 Div. 331.**

Court of Appeals of Alabama.

Aug. 27, 1968.

Rehearing Denied Oct. 8, 1968.

Bankhead, Petree & Savage, Jasper, for appellant.

Bill Fite, Hamilton, for appellees.

CATES, Judge.

Mr. and Mrs. Aldridge got a $1,000 negligence judgment because Coalite's strip mine blasting caused vibrations which shook their house.

The judgment below can only be upheld if the evidentiary rule of res ipsa loquitur applies to prove negligence as a product of vibrations or concussions from blasting. We hold it does and affirm.

## I.

### Facts

Coalite, Inc., while engaged in strip mining, admittedly set off large quantities of explosives about 6100 feet from appellee's house.

Coalite did the blasting complained of during the months of June, July, and August of 1965. Shots were set off once a day, usually in the evening.

About 120,000 pounds of dynamite and ammonium nitrate were set off during this period. No rocks or debris were thrown upon the Aldridges's property.

Leethel Aldridge, one of the plaintiffs, testified that he heard the blasting and that it shook loose a rock pillar under the house causing it to sag an inch or two. A crack appeared under the back door and the kitchen flue was shaken off. Plaintiff estimated the total damage to the house to be $1,000.

Lorene Aldridge, the other plaintiff, testified that she heard the explosions on an average of one time a day. On the day when most of the damage occurred, she heard a real loud noise. Part of the flue fell in just before she heard this sound and caused extensive damage to the kitchen. Mrs. Aldridge jumped up, went to the door, and saw dirt "and rocks going above the trees where the blast had taken place."

Witness Wheeler, for appellant, testified that the blasting was done in accordance with the usual customary methods of shooting.

Wheeler testified (R. 70):

"The amount of the explosives, my instructions was to be as careful and all as we could about damaging things and so forth. We didn't want to put off oversized shots, *so we just cut it down.*" (Italics added.)

Roberts, the president of appellant, testified (R. 129, et seq.):

"Q How near were you to the residences where you were shooting down in the town of Brilliant?

\*     \*     \*     \*     \*     \*

"A We have shot within 300 feet of houses in Brilliant.

"THE COURT: Mr. Roberts, are you familiar with the rock formation up there where Mr. Aldridge lives? Have you ever drilled up there?

"WITNESS: Not at that particular spot. There is sand rock under most of the entire area. It varies in depth from four or five feet to 30 feet, and there is shale over there.

"THE COURT: Do you know the depth of the rock from the surface underlying

where Mr. Aldridge's house is * * * How deep it is to the rock?

"WITNESS: I have not drilled it. I couldn't say, but I would guess * * *

"MR. FITE: Object to his guessing.

"THE COURT: Have you drilled anywhere nearby?

"WITNESS: I know that the rock down at the Box boy's mine and the rock at our strip pit north of it * * * between the two

"THE COURT: What is the similarity between them, the ground or rock structure, or formation?

"WITNESS: At Brilliant where we were blasting and out at Rock City Lake it is quite similar Birlliant has more shale. In the Rock City area there is more sandstone laying on the coal. The sandstone is a little thicker and denser than in the Brilliant area.

"Q (By Mr. Petree): On the occasions, Mr. Roberts, that you were there and observed the shooting that was going on at Coalite, Inc., during the summer of 1965, June, July and August, state whether or not, in your opinion, the superintendent and those shooting under his supervision were conducting the blasting operation in accordance with good blasting procedures?

"MR. FITE: We object to that as incompetent, irrelevant, and immaterial.

"THE COURT: Overruled.

"A Yes.

"Q When you moved into the Rock City Area with your mining operation did you take note of the fact that it was generally a residential area?

"A Yes, sir.

"Q  Did you make any determination as to the size of shots you could explode out in that area  * * *

"MR. FITE: We object to that as self-serving.

"THE COURT: Overruled.

"A  All of our shots  * * *

"MR. FITE: Object to that.

"THE COURT: Sustained.

"A  Yes, sir.

"Q  What was your answer?

"A  Yes.

"Q  Tell the Court and the jury what steps you took?

"A  We followed government bulletin, Bureau of Mines, No. 442.

"MR. FITE: We object to that as incompetent, irrelevant, and immaterial.

"A  * * *  which is the only study I know of that has been made of blasts and the seismic effects of blasts, which study was made by the Chief of the Bureau of Mines, Department of Interior. It sets out the different modes of dynamiting in rock, outcrops, and other cuts, and we have gone strictly by this book.

"MR. FITE: We object to that self-serving statement.

"THE COURT: Sustained.

"Q  (By Mr. Petree): Is this the book you have referred to which you obtained from the Government Bureau of Mines (indicating)?

"A  Yes.

"Q  Would you state how you utilize that book in determining what would be a safe amount of explosive to use when you are a certain distance from residences?

"MR. FITE: We object to that.

"THE COURT: Overruled.

"A  The book has a table showing the displacement, various weights, sizes on different types of explosives in different columns. You determine by the use of these various columns the safe distance you can fire certain explosives  * * *  without causing damage.

"Q  Will you tell the jury what was the average explosive load that you would use in firing shots down at the Coalite operation during the months of June, July and August of 1965?

"A  150 to 200 pounds to the hole.

"Q  Well, what was the most explosive that would be fired at one time?

"MR. FITE: We object to that.

"THE COURT: Sustained.

"Q  (By Mr. Petree): During the times that you were there what was the highest quantity of explosive that was fired during the stripping operation?

"A  I have been there when we put 7,000 pounds in the ground. We fired it in the same pattern as indicated.

"Q  Used a delayed pattern?

"A  Yes.

"Q  Will you take that table there and use 'quantity of explosion, 7,000 pounds', and see what the table shows to be the effect of the blast on a dwelling house situated 6,000 feet away?

"A  By the way we shot or instantly?

"Q  By the use of delays?

"MR. FITE: We object to it unless that book says that applies to this particular

place. Apparently that book refers to something you do generally. It doesn't say * * *

"Q (By Mr. Petree): Well, Mr. Roberts, if you fired 7,000 pounds of explosive down there that operation through the use of a delayed pattern and in accordance with this bulletin 442 which you have referred to, would that cause any damage, whatsoever, to a house situated 6,000 feet away from that explosion?

"MR. FITE: We object to that. It invades the province of the jury.

"A No, sir, we could shoot 10 times that much safely.

MR. FITE: We move to exclude that as not responsive.

"THE COURT: Gentlemen, don't consider that last answer.

"Q (By Mr. Petree): Based on your knowledge of the firing that was done down there, and based on the times you were there present when the firing was done during the months of June, July and August of 1965, do you have an opinion as to whether any of those explosions could have caused any damage to Mr. Aldridge's house located 6,100 feet away?

"MR. FITE: We object to that. There is some testimony to the effect that his house was less than a mile away.

"THE COURT: Sustained." (Italics added.)

## II.

### Argument

Essentially Coalite argues here that the trial judge erred in refusing the affirmative charge (variantly phrased in Charges 29 and 30) and in overruling its motion for new trial because of the claimed validity of ground 2 thereof.

Coalite says that not a scintilla was adduced to show it was negligent toward the Aldridges. Conversely, to demonstrate no connection between injury and agency it says there was no "proof that their damage was proximately caused by negligence of appellant in the conduct of its blasting operation."

Other claims of error are set out in brief. However, they all are covered by (1) the trial judge's control over the qualification of expert witnesses, or (2) the harmless error rule (which inter alia would cover a vague jury direction [1] as to fright as a ground for consequential damages).

We consider that, in these two last mentioned specifications, appellant has not demonstrated error to the degree of reversibility.

## III.

Appellant argues:

"* * * In Mitchell v. Richardson, 277 Ala. 651, 173 So.2d 814, the Supreme Court of Alabama made this comment:

" 'Evidence here as to the noise and land vibrations caused by the blastings was insufficient, without more, to prove that the defendant was guilty of negligence as charged in the complaint.'

"The language of the Court in Republic Steel Corporation v. Peoples, et al. (1954) 217 F.2d 236, makes it clear that the mere fact of damage to the plaintiffs' residence is not sufficient to make out a prima facie case. * * *"

In the *Republic Steel* case, supra, the opinion expressly acknowledges fealty to Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. The opinion then

1. Appellee in brief (p. 13) argues that: (a) the trial judge excluded questions seeking to elicit feelings of fear when blasting went on; and (b) therefore, the jury had no evidence before them of the plaintiffs, or either of them, being frightened. Also that the appellant's exception to the oral charge was too elliptical. Bentley v. Lawson, 280 Ala. 220, 191 So.2d 372.

anchors itself Alabama-wise on Ex parte Birmingham Realty Co., 183 Ala. 444, 63 So. 67.

This latter case was one of wantonness in acts of trespass and not for negligence. Moreover, the Supreme Court did not revise the opinion of this court (Birmingham Realty Co. v. Thomason, 8 Ala.App. 535, 63 So. 65) so that the Supreme Court's opinion is not as binding as if the Supreme Court had issued the writ and then affirmed. For both of these reasons, it seems that the Fifth Circuit's citation of it was a non sequitur.

We find this infirmity obliquely admitted in Codell-Oman Construction Co. v. Sorensen, 273 F.2d 703.[2]

The Codell-Oman opinion refers to Ledbetter-Johnson Co. v. Hawkins, 267 Ala. 458, 103 So.2d 748, and Ledbetter-Johnson Co. v. Black, 268 Ala. 151, 105 So.2d 448, to show that Alabama, in essence, admits res ipsa loquitur in negligent blasting trials.

In the *Hawkins* case on rehearing, 267 Ala. at 463, 103 So.2d at 752, we find this conclusion:

"We think the quoted testimony of E. J. Ladd, the city engineer, sufficiently shows that a jury question was presented on the question of negligence. * * *"

The testimony which followed could be construed either as that of an expert hypothesized on his knowledge of chert pits and explosives, plus his actual knowledge of the terrain in question or simply a conclusion that damage beyond the pit in question was an indication of negligence.[3]

In Vulcan Materials Co. v. Grace, 274 Ala. 653, 151 So.2d 229, we find:

"A reading of the Ledbetter-Johnson opinion, supra, on rehearing, shows clear-

ly that the plaintiff, through an expert witness, presented evidence to the effect that the blasting had been improperly and negligently done. Such positive evidence renders the Ledbetter-Johnson case, supra, inapplicable to the present case where the record is entirely lacking in any evidence tending to show negligence on the part of this defendant."

Before this comment, the opinion rejected (on stare decisis) the doctrine of absolute liability for nontrespassory blasting, e. g., concussions of air or terrestial vibrations.

The court did not, however, rule out the doctrine of Rylands v. Fletcher (1868) L.R., 3 H.L. 330, as one of "strict"—as distinguished from absolute—liability if that doctrine is capable of articulation.[4] Cf. Salmond on Torts (13th Ed.), § 6, pp. 23–24. Nor did Justice Harwood exclude the evidentiary aide of res ipsa loquitur.

In Restatement, Torts, Second, § 328 D, Res Ipsa Loquitur, we find:

"(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

"(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

"(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

"(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

"(2) It is the function of the court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

2. There the Fifth Circuit, per Tuttle, J., pictured our Supreme Court as the chameleon rather than his own Court.

3. We do not try to reconcile (Ladd's evidence to which objection was taken) that

basis in the *Hawkins* case with the holding in Marigold Coal, Inc. v. Thames, 274 Ala. 421, 149 So.2d 276 (hn. 9–11).

4. Note the "escape" lacking in Read v. J. Lyons & Co., Ltd. [1947], A.C. 156.

"(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached."

This statement is compatible with the decisions of our Supreme Court. Thus in Alabama Power Co. v. Berry, 254 Ala. 228, 48 So.2d 231, we find Mr. Justice Simpson opining:

"* * * Briefly stated, res ipsa loquitur is: When a thing which causes injury, without fault of the injured person, is shown to be under the exclusive control of the defendant, and the injury is such as, in the ordinary course of things, does not occur if the one having such control uses proper care, then the injury arose from the defendant's want of care. San Juan Light & Transit Co. v. Requena, 224 U.S. 89, 32 S.Ct. 399, 56 L.Ed. 680.

"For the doctrine to apply, there are at least three essentials: (1) the defendant must have had full management and control of the instrumentality which caused the injury; (2) the circumstances must be such that according to common knowledge and the experience of mankind the accident could not have happened if those having control of the management had not been negligent; (3) the plaintiff's injury must have resulted from the accident. Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257; * * *

"The function of the doctrine is to supply a fact which must have existed in the causal chain stretching from the act or omission of the defendant to the injury suffered by the plaintiff, but which the plaintiff, because of circumstances surrounding the causal chain, cannot know and cannot prove to have actually existed. The missing fact is that the defendant was negligent. The rationale of the theory, in part, is that defendant in charge of the instrumentality which caused the injury is possessed of superior knowledge and by reason thereof is bet-ter advantaged than plaintiff to know the true cause and therefore, negligence is presumed and the burden is upon the defendant to adduce proof to overcome the presumption. * * *"

Those familiar with circumstantial evidence, particularly in a criminal case where the burden is greater, will recall the classical "tracks in the snow" charge by Shaw, C. J., in Commonwealth v. Webster, 5 Cush., Mass., 295, at 312.

In McCreary v. State, 42 Ala.App. 410, 166 So.2d 914, and Ison v. State, 44 Ala. App. 6, 200 So.2d 506, we used the following classification of presumptions:

"Presumptions are of three sorts: (1) Conclusive (i. e., irrebuttable) *praesumptiones juris* and *de jure*, unassailable by force of law, Baxter v. State, 41 Ala. App. 533, 143 So.2d 191; (2) inconclusive (i. e., rebuttable) *praesumptiones juristantum* which stand by force of law as true until disproved; and (3) factual (i. e., legally unaided) *praesumptiones hominis vel facti*, e. g., possession is a strong presumption of fact."

To this list some authorities add a "mixed (or quasi) presumption," Donald v. Swann, 24 Ala.App. 463, 137 So. 178. See Williams, Alabama Evidence, §§ 13 and 14, Res Ipsa Loquitur and Procedural Effect of Res Ipsa Loquitur, particularly at pp. 29 and 30, citing Montgomery & Eufaula R. Co. v. Mallette, 92 Ala. 209 (hn. 4), 9 So. 363. Some of the language in older opinions verges on making res ipsa loquitur a presumption of law, though rebuttable.

However, we find in Nelson v. Lee, 249 Ala. 549, 32 So.2d 22:

"* * * Except in certain specified types of cases (see Southeastern Greyhound Line v. Callahan, 244 Ala. 449, 13 So.2d 660), the rule in this jurisdiction is that as a result of prima facie proof or legal presumption the duty of going forward with the evidence shifts to the defendant but not the burden of proof. Lawson v. Mobile Electric Co., 204 Ala.

318, 85 So. 257; Cox v. Roberts, 248 Ala. 372, 27 So.2d 617."

This we construe as presenting the rule of the defendant's risking nonpersuasion after the plaintiff rests on having made out a prima facie case by the scintilla rule (or stronger proof). Birmingham Union Ry. Co. v. Hale, 90 Ala. 8 (hn. 9), 8 So. 142.

Alabama Power Co. v. Bryant, 226 Ala. 251 (hn. 11), 146 So. 602, cites 45 C.J. Negligence § 779, which reads:

"Although the rule of res ipsa loquitur applies, in a proper case, so as to present a presumption or inference of negligence, it has no application to proximate cause and does not dispense with the requirement that the act or omission upon which defendant's liability is predicated be established as the proximate cause of the injury complained of. Furthermore, while the doctrine permits an inference that the known act which produced the injury was a negligent act, it does not permit an inference as to what act did produce the injury, and there can be no foundation for the application of the doctrine where the physical act or thing which caused the injury is unknown or not disclosed."

This is but a limitation on reasoning from effect to cause. That is, the possibility of more than one causal agent should be eliminated and the process of elimination must preponderate to exclude acts other than that of the defendant. See 45 C.J., § 780, p. 1213, fn. 5, 65A C.J.S. Negligence § 220.11 et seq. This, of course,

also excludes acts of the plaintiff and legally excusable Acts of God and the like.

Here we find at least one instance during an earth tremor (accompanied by the noise of blasting) when bricks were shaken loose from the plaintiffs' flue. Thereupon, Mrs. Aldridge got up and descried dust and rocks spewed up into the atmosphere over the mountain where the defendant was strip mining. This last sufficed to show an act of the defendant and not of another —whether miner or farmer blowing up tree stumps.

As we have indicated above, Republic Steel Corp. v. Peoples, supra, is without support as to Alabama's excluding res ipsa loquitur in blasting cases where negligence is averred. Hence, the cases listed in footnote 18, p. 883, 31 Am.Jur., 2d, Explosions and Explosives, § 110, are only:[5] Crocker v. W. W. Wyman, Inc., 99 N.H. 330, 110 A.2d 271; B. G. Young and Sons, Inc. v. Kirk, 202 Va. 176, 116 S.E.2d 38. See also V. N. Green & Co. v. Thomas, 205 Va. 903, 140 S.E.2d 635, 9 A.L.R.3d 376.

In Kushner v. Dravo Corp., 339 Mass. 273, 158 N.E.2d 858, p. 862, footnote 3, states in part:

"* * * The effect of the minority rule [i. e., negligence in nontrespassory blasting] has been tempered or avoided in a number of jurisdictions which retain it. See Ledbetter-Johnson Co. v. Hawkins, 267 Ala. 458, 103 So.2d 748; * *"

Since the plaintiff's damaged building adjoined a public road, the possibility of

5. We have also deleted Kansas from the cases in footnote 18, supra. City of Cherrypale v. Studyvin, 76 Kan. 285, 91 P. 60, 11 L.R.A.,N.S., 385, in nowise supports the text of the second sentence of § 110 of 31 Am.Jur.2d, Explosions and Explosives. That sentence reads: "* * On the other hand, in some cases it has been stated flatly that the doctrine of res ipsa loquitur has no application in blasting cases. * * *"
Again in Bacon v. Kansas City Terminal Ry. Co., 109 Kan. 234, 198 P. 942, though there is no reference to res ipsa loquitur in so many words, yet there the defendant's witnesses implied that they were negligent and in the penultimate paragraph of the opinion, we find: "* * * Since at the close of the testimony there was evidence of negligence, the ruling on the demurrer to the plaintiff's evidence is not now material. * * *"
Since "res ipsa loquitur" is but one manner of plaintiff's establishing a prima facie case of negligence, then the *Bacon* case must be classed as one resting on res ipsa loquitur.

injury from "some agency or instrumentality other than the dynamite set off by the defendant," was the rationale for not applying res ipsa loquitur in the particularity of Crocker v. W. W. Wyman, Inc., 99 N.H. 330, 110 A.2d 271. The opinion concludes, however, that the trial court erred in non-suiting the plaintiff.

This analysis leaves the Virginia opinions by themselves, the first being B. G. Young & Sons, Inc. v. Kirk, 202 Va. 176, 116 S.E.2d 38. There we find:

> "Plaintiffs concede that the principle of res ipsa loquitur is not applicable. While there is some conflict in decisions as to whether or not the principle applies to blasting operations, yet the weight of authority seems to be against its applicability. The doctrine's relation to blasting is discussed in 22 Am.Jur., Explosions and Explosives, § 96, p. 214.

> \*　　\*　　\*　　\*　　\*　　\*

> "There is no claim that what was done constituted a nuisance or violated any statute or ordinance. Young was engaged in the performance of lawful and necessary work, and negligence is not to be presumed. The burden is upon plaintiffs to prove defendant was negligent. 13 M.J., Evidence, § 52. Lacking evidence that the shots were improperly prepared or fired, and absent any expert testimony that the explosions were excessive or unnecessarily violent, negligence may not be inferred because concussions, vibrations or tremors of earth or air of undetermined and unmeasured intensity were noticeable at considerable distance and cracked plaintiffs' walls and caused the consequential damage complaned [sic] of. \*　\*　\*"

Next in V. N. Green & Co. v. Thomas, 205 Va. 903, 140 S.E.2d 635, 9 A.L.R.3d 376, we again find an unrationalized exclusion of the res ipsa loquitur doctrine:

> "In the instant case the defendant contractor was performing a contract for the construction of a public highway in a lawful manner on behalf of the State Highway Department. The only way it could construct the highway in accordance with the plans and specifications was to make a cut through the rock by blasting. The blasting operations were conducted by an expert in the field of explosives, which was required by the department. Moreover, an agent of the department was present when the 'certified blaster' put dynamite in the holes bored in the rock when most of the blasting complained of was done. Hence the defendant could not be held personally liable for consequential damages caused to the plaintiffs' home by vibrations and concussions in the absence of proof that the blasting was negligently performed. Thus it was error for the court to instruct the jury that the defendant was liable for damages to plaintiffs' house if the damages sustained were a direct and proximate result of the blastings, irrespective of its negligence.

> "Defendant says that there was no evidence that it was negligent in the performance of the blasting operations and the trial court erred in not striking the evidence and entering summary judgment for it.

> "The burden was on the plaintiff to prove that the defendant or its agents, servants or employees were guilty of some specific act or acts of negligence which directly and proximately contributed to the resultant damage. Negligence cannot be presumed, and the doctrine of res ipsa loquitur has no application here. Young and Sons v. Kirk, 202 Va. 176, 182, 183, 116 S.E.2d 38, 42, 43; 22 Am.Jur., Explosions and Explosives, § 96, p. 214; Anno., 20 A.L.R. 2d 1372, 1388, 1397.

> \*　　\*　　\*　　\*　　\*　　\*

> "In the present case the evidence is insufficient to prove that the defendant was negligent in performing the blasting operations. Plaintiffs offered no expert testimony to prove that excessive

amounts of explosives were used, that the shots were unnecessarily violent and destructive, or that they were in danger- ous proximinty to plaintiffs' property. On the other hand, defendant's evidence showed that the blasting operations were conducted by an expert in the field of explosives. Hence it may not be inferred from the resultant damage to plaintiffs' home, caused by vibrations and concussions, that the defendant was guilty of negligence in performing the blasting operations. To hold otherwise would be to indulge in speculation and surmise.

"For the reasons stated, the judgment is reversed and final judgment is here entered for the defendant."

The New York Court of Appeals in Schlansky v. Augustus V. Riegel, Inc., 9 N.Y.2d 493, 215 N.Y.S.2d 52, 174 N.E.2d 730, adopted the view that a jury question is "presented by a showing that the explosions were so powerful as to do great damage." This we consider is a version of res ipsa loquitur. See the same comment in Heimer v. Johnson, Drake & Piper, 51 Misc.2d 958, 274 N.Y.S.2d 520; also Alexander, 1967 New York Survey, Torts, 19 Syracuse Law Review at p. 474.

Thus the bedrock of the Alabama doctrine of negligence has in its indigenous setting been seriously eroded if not discarded. Inasmuch as Bessemer Coal, Iron & Land Co. v. Doak, 152 Ala. 166, 44 So. 627, 12 L.R.A.,N.S, 389, rests intellectually on Holland House Co v. Baird, 169 N.Y. 136, 62 N.E. 149, derived from Booth v. Rome, W. & O. T. R. Co., 140 N.Y. 267, 35 N.E. 592, 24 L.R.A. 105, serious doubt exists as to the validity of the *Doak* case.

Also, the Appellate Division, Fourth Department, in Bucci v. S. J. Groves & Sons, Inc., 17 A.D.2d 906, 233 N.Y.S.2d 7, referred to severity, frequency and long duration of the defendant's blasting as sustaining a charge of negligence.

Ammonium nitrate seems to have come into use as an explosive during the latter part of the 19th Century. The Encyclopaedia Brittanica refers to ammonia dynamites. The briefs do not tell us as to whether or not in Coalite's operations of instant concern ammonium nitrate was used in dynamite (i. e., in cartridge or stick) form or loose as in the case of bagged ammunition employed as the propellant in naval rifles.

Even the most casual reading of either opinion (majority—Reed, Vinson, Burton and Minton; minority—Jackson, Black and Frankfurter) in Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, will convince the reader that ammonium nitrate has a tremendous explosive capacity.

Appellant devotes much argument to a claim that either it was entitled to the affirmative charge or the trial judge erred in sustaining objection to questions as to whether Coalite's blasting was done in a "workmanlike manner." Conversely, Coalite contends that it did conclusively show:

"* * * At no time were more explosives used than were reasonably necessary to remove the overburden. The testimony of defendant to the effect that, Appellant's blasting operations were conducted with due care and according to good blasting practices, was undisputed. No rebuttal testimony was offered by Appellees tending to refute Appellant's evidence that its blasting operations were performed in an ordinary and careful manner and with reasonable care."

In appellant's recital of evidence we find no clear cut statement of what is good blasting practice for the prevention of underground vibrations or atmospheric concussions to degrees not injurious to surrounding property. In Birmingham Realty Co. v. Thomason, 8 Ala.App. 535, 63 So. 65, Walker, P. J., in a case of wantonness in blasting frequently with trespasses, described the "operations, as carried on throughout a considerable period of time, without due precautions being taken * * within the zone of danger therefrom,

amounted to more than an isolated trespass, and assumed the proportions of a nuisance. * * *."

■ Repetitive negligent acts of the same sort may cumulate to a private nuisance. Lehigh Portland Cement Co. v. Campbell, 27 Ala.App. 130, 166 So. 727; Lehigh Portland Cement Co. v. Donaldson, 231 Ala. 242, 164 So. 97; Prosser, Torts (3rd Ed.), 596.

■ Under Supreme Court Rule 9, we look only to appellant's brief for the evidence. Thus, witness Wheeler is there said to have testified that he conducted the blasting in question "in accordance with usual customary methods of shooting." Coalite's brief, page 7. No evidence of what was the "usual custom" appears in brief to have been given by Wheeler.

Witness Markham testified that he "discussed" firing techniques and the amount of powder to be used with the State Coal Mine Inspector. Coalite's brief, page 9. No proof of approval or disapproval by the Department of Industrial Relations was adduced.

■ Indeed, whatever might be done or required under the Alabama Coal Mine Safety Law of 1949, Article XIII, Strip Mining Operations, §§ 72–86 (Act 207, p. 242, approved July 12, 1949), would not affect the rights and duties between Coalite and the Aldridges. This because that statute was not enacted (except where expressly stated, e. g., § 82(d), blasting near roads) for the benefit of the public generally.[6] Williams v. Alabama Fuel & Iron Co., 212 Ala. 159, 102 So. 136.

Witness Dotson, an explosive salesman, was on the Aldridges' objection not permitted to testify as to several matters calling for his opinion. To sustain these rulings, appellees in brief contend:

"* * * This witness had only made a few visits to the Appellant's operation where the blasting was taking place. (Transcript pages 116 and 117) The Appellant, before asking this witness a question which required an answer from an expert, made no attempt to prove that he had had sufficient opportunity, to observe Appellant's operations. Unless this witness was present, during all or most of the blasting, he, of course, could not testify as an expert. * * *"

Strict analysis of the question propounded to Dotson (Assignment of Error No. 34) shows it to be based on an assumption that he knew the explosive force "reasonably necessary to remove the coal."

In Harbison-Walker Refractories Co. v. Scott, 185 Ala. 641, 64 So. 547, a like question was put to witness Harris. He had been qualified by:

"* * * 'I have had a great deal of experience in the blasting of solid rock like that up in the mountain. My experience was in helping to build a number of railroads, and on all of these railroads I have done blasting. The heaviest blasting I have done was on the Seaboard, out near Ragland, in a rocky country.' * * *"

Here in brief, page 10, appellant contends that the following qualified Dotson (as much as the foregoing had qualified Harris):

"* * * that for three years he has been familiar with blasting practices in strip pit mining operations in Northwest Alabama. (Tr. pp. 96–97). He averaged shooting at different locations once or twice a week."

■ In the language used in the *Harbison-Walker* opinion, supra, it is an actionable wrong to blast to a greater extent or use more explosives than is reasonably necessary to the injury of another. Under this definition of reasonableness, the zone of danger would expand or contract according to distance to the property of others,

---

6. The only statute we have found which remotely impinges on the operations here is the conditional immunity enacted in Code 1940, T. 14, § 125.

geological structures, atmospheric conditions, and perhaps topography. Hence, we consider it was here within the trial judge's discretion to decide whether Dotson had been qualified as an expert within the realm contemplated by the question.

Under Cooper v. Thomson Implement Co., 272 Ala. 655, 133 So.2d 391, we find no palpable abuse of discretion as therein defined and applied. See also, as to the hiatus in the questions propounded, Judge McElroy's discussion in Law of Evidence in Alabama (2nd Ed.), § 127.01(4).

In brief, pages 11 et seq., we find (the appellant's transcript references are to the transcript of testimony and not to the record):

"The last witness for Appellant was David Roberts, III, who testified that he is President of Coalite, Inc., which company is engaged in strip mining of coal. Mr. Roberts testified that the Appellant had a total of 26 employees. At no time during 1965 did Brilliant Coal Company set off any explosives in Marion County, Alabama. Appellant's mining operation was moving away from Appellees' home during the summer of 1965 and was situated to the North and East of Appellees' home. (Tr. p. 102). In June, July and August, 1965, the mining operations were being conducted over 6100 feet from Appellees' property.

"At no time during the summer of 1965 did Appellant conduct mining operations to the West or Northwest of Appellees' house. To the West of Appellees' house Box Brothers were operating an underground mining operation at a distance of from one-half to three-quarters of a mile from Appellees' home.

"Mr. Roberts received his education at Princeton University, specializing in Chemical Engineering and Economics. He has been engaged in coal mining operations continuously since 1936. Since 1953 he has been engaged in strip mining operations. (Tr. p. 104). Mr. Roberts also studied Mining Engineering. He is

a member of the American Institute of Mining Engineers. He has studied Surveying and Geology.

"The witness was familiar with the strip mining being done by Appellant during the summer of 1965. Mr. Markham and Mr. Wheeler were in charge of the shooting but the witness would lay out the shooting pattern. The witness then explained to the jury the method of laying out the shots and the method of firing that was used by Appellant during the summer of 1965. The witness testified that he has loaded the holes himself, he has fired the shots and has instructed his employees in the proper firing techniques.

"During the summer of 1965 they used 150 to 200 pounds of Ammonium Nitrate per hole. The firing was done with delays so that no more than 600 pounds would explode at one time on the front line and 800 pounds at one time on the back line.

"The force of the blasts from the mining shots was toward the open space and not toward the hill. (Tr. p. 109).

"The witness testified that in his opinion the blasting that was being done by Appellant near Rock City in June, July and August, 1965, was not done with more explosives than were reasonably necessary to remove the overburden. He testified that Appellant's blasting was done in a workmanlike manner. (Tr. p. 110).

"The witness testified that Appellant's blasting operations were conducted in accordance with good blasting procedures. (Tr. p. 111). Appellant followed Bureau of Mines Bulletin No. 442 in its blasting operations. The witness then explained his use of Bulletin No. 442 and showed that by using the tables in said Bulletin it is possible to determine the safe distance explosives can be fired without causing damage.

"On cross-examination the witness testified that the most explosives ever fired

in the mining operation was 12,000 to 13,000 pounds placed in 65 holes—and fired in a delay pattern—200 pounds to the hole at intervals. (Tr. p. 121)."

Much of this testimony has been quoted by us above verbatim. Suffice it to say that each conclusion, i. e., explosives "reasonably necessary," "workmanlike manner," and under "good blasting procedures," was in the form of Robert's judgment (or opinion).

As to Bureau of Mines Bulletin No. 442, we observe:

a) The Bulletin did not come into evidence either expressly in being proffered or by being read from in whole or in part;

b) Roberts had not (nor any other witness) identified it or its compilers as being esteemed as authoritative [7]—City of Dothan v. Hardy, 237 Ala. 603, 188 So. 264, 122 A.L.R. 637; Wiggins v. State, 39 Ala.App. 433, 104 So.2d 560; Anno. 75 A.L.R.2d 778.

c) Since 30 U.S.C.A. § 471(a) (7), expressly excludes "any strip mine," the Bulletin does not, even between miners and operators let alone third parties, have the force of law; and

d) Roberts merely alluded to following the Bulletin but did not read from it.

Hence, we think that any one or more of a) through d) would be reason or reasons for us to forego consideration of any purported expertise from Bulletin 442 here on appeal. We cannot take judicial notice of its substance.

Roberts gave some testimony of geological opinions. The general rule of such testimony was stated in a case wherein Dr. Walter B. Jones, the State Geologist, gave virtually an apodictic opinion against the plaintiff's contention. There (Dickey v. Honeycutt, 39 Ala.App. 606, 106 So.2d 665 (hn. 4), Price, J., wrote:

"True, the expert testimony of Dr. Jones was to the effect that the well was not affected by the mine, however, such expert testimony is not conclusive on the jury and they are not necessarily bound by it. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755; Smith v. Smith, 254 Ala. 404, 48 So.2d 546."

Formerly Kentucky [8] followed the same rule as Alabama of requiring proof of negligence to fasten liability for nontrespassory blasting. In Brooks-Calloway Co. v. Carroll, 235 Ky. 41, 29 S.W.2d 592, the distance of the plaintiff's house was about a mile away. The court pointed out that the defendant continued blasting with vibratory effects after the plaintiff complained of injury.

Here Coalite's witness, Sanderson, who was plant superintendent, testified:

" * * * On July 8, 1965, Appellee Leethel Aldridge complained to him that Appellees' house had been damaged by Appellant's mining operation. On July 9, 1965, he and J. M. Markham went to Appellees' house. He found a frame house—four or five rooms. It had black tar paper on the outside with an iron ore rock foundation. He saw eight or ten bricks on the outside of the house lying in the yard. Mr. Aldridge complained of damage to his flue and a stove handle

---

7. Merkle v. State, 37 Ala. 139 (from Reporter's statement of the case): " * * * The State afterwards read in evidence to the jury an extract from the 'United States Dispensatory,' by Wood & Burke, on the subject of vinous and fermented liquors; having first proved, by the testimony of a practicing physician, 'that said book was recognized by the medical profession as good authority on all subjects therein treated of;' * * * "

8. Kentucky now uses the rule of Rylands v. Fletcher, supra, or strict liability for "escaping" harmful instrumentalities. Lynn Mining Co. v. Kelly (Ky.), 394 S.W.2d 755.

being bent. He made no other complaints. (Tr. pp. 72, 73)."—from Appellant's brief, page 8.

Coalite's answer to written interrogatory No. 2 (date of and amount and kind of material used for each explosion) was:

| "Date | No. of Holes | No. of Pounds of Nitrate Per Hole |
|---|---|---|
| "June 2, 1965 | 8 | 300 |
| "June 8, 1965 | 65 | 5 to 10 |
| "June 10, 1965 | 34 | 200 |
| "June 12, 1965 | 15 | 200 |
| "June 15, 1965 | 32 | 50 to 100 |
| "June 18, 1965 | 18 | 150 |
| "June 19, 1965 | 12 | 150 |
| "June 22, 1965 | 18 | 200 |
| "June 25, 1965 | 32 | 200 |
| "June 28, 1965 | 44 | 150 |
| "June 29, 1965 | 48 | 50 to 200 |
| "June 30, 1965 | 31 | 150 to 200 |
| "July 1, 1965 | 43 | 100 to 200 |
| "July 2, 1965 | 31 | 100 to 150 |
| "July 8, 1965 | 15 | 100 |
| "July 8, 1965 | 13 | 150 |
| "July 26, 1965 | 41 | 200 |
| "July 28, 1965 | 70 | 150 to 200 |
| "July 29, 1965 | 31 | 150 to 200 |
| "Aug. 4, 1965 | 44 | 150 to 200 |
| "Aug. 26, 1965 | | 65 sacks weighing 40 pounds per sack were used; blasting record does not show number of holes drilled. That information will be furnished when obtained from the driller. 55 sacks weighing 50 pounds per sack were used." |
| "Aug. 27, 1965 | 45 | |

<hr>

We note that after July 8 there was an interval of 18 days of no explosions. But also that, when Coalite resumed blasting, the quantity per hole and the number of holes drilled did not decrease. Indeed July 28 would appear to be the most active day with the greatest tonnage (5–7 short tons) of nitrate set off.

█ In this connection, we refer again to the present New York concept of negligence in shaking or concussive blasting, i. e., severity, frequency and long duration. Here we consider the dispute in the evidence was sufficient to support the verdict (and the trial judge's refusal to take the case away from the jury) under either or both of the theories of a prima facie case —particularly under our scintilla rule—as expressed in the *Brooks-Calloway, Schlansky* and *Bucci* cases, supra.

Finally, we have studied the evidence as to the sturdiness of the Aldridges's house. While it may have been humble and modest in construction [9] nothing implies that it was jerry-built. Though, perhaps, it would not have withstood an earthquake or tornado, yet certainly it was more than a tent or the Tea House of the August Moon. A poor man is as much entitled to the Law's pro-

9. In Duckett v. Clement Bros., 6 Cir., 375 F.2d 963, the quality of the plaintiff's house raised a jury question on the quantum of damages.

tection as a rich one, and often more in need of it.

## IV.

### Conclusion

Res ipsa loquitur is no stranger to our jurisprudence. We applied it in Smith v. Kennedy, 43 Ala.App. 554, 195 So.2d 820, an action against a hairdresser by a patron who suffered chemical burns.

Lawson v. Mobile Electric Co., 204 Ala. 318, 85 So. 257 (hn. 4), must be construed in the light of Birmingham Electric Co. v. Davis, 244 Ala. 338, 13 So.2d 888 (hn. 3 and 4). See Southern Ry. Co. v. Hargrove, 26 Ala.App. 165, 155 So. 316.

In Holmes v. Birmingham Transit Co., 270 Ala. 215, 116 So.2d 912—a carrier and passenger case—under the refusal of Charge 12, reference is made to the defendant's uncontradicted and uncontroverted rebuttal evidence as rendering functus officio any inference of negligence from res ipsa loquitur. Actually in view of the verdict it seems that in *Holmes* the reference to Birmingham Electric Co. v. Davis, 244 Ala. 338, 13 So.2d 888, and Langley Bus Co. v. Messer, 222 Ala. 533, 133 So. 287, if not misleading, is certainly mere dictum. Indeed under [4] of the opinion, 270 Ala. pages 221 and 222, 116 So.2d 912, it is pointed out that one of the basic elements was lacking.

This same criticism of failure to show defendant's exclusive control can also be levelled at the *Lawson* opinion. Moreover, as we read Iron City Grain Co. v. City of Birmingham, 217 Ala. 119, 115 So. 99, particularly as applied in Sawyer v. Stabler, 279 Ala. 496, 187 So.2d 251, it would seem that Anderson, C. J., understood Sayre, J., in the *Lawson* opinion to be discussing the function of the jury and the inferences allowable on a verdict.

■ Accordingly, we believe that if, in accordance with Alabama Power Co. v. Berry, 254 Ala. 228, 48 So.2d 231, the plaintiff adduces circumstances within the three basic requisites of res ipsa loquitur, though the defendant may adduce evidence tending to refute the implication of negligence, *ordinarily* the resolution of the conflict is a jury question.

In this so-called procedural nature of res ipsa, we consider it advisable for clear thinking to put aside the passenger-carrier cases. Thus Prosser in an early (1936) paper, 20 Minn.L.Rev. 241, at 250, fn. 52, cites the same basic precedent (Montgomery & Eufaula Ry. Co. v. Mallette, 92 Ala. 209, 9 So. 363) as did Foster, J., in Southeastern Greyhound Lines v. Callahan, 244 Ala. 449, 13 So.2d 660.

In Greyhound Corp. v. Brown, 269 Ala. 520, 113 So.2d 916 (hn. 1), the distinction between carrier negligence under res ipsa and that of other feasors is well illustrated.

■ Procedurally, we consider the *Lawson* case stands for the principle that breach of duty (to be nonnegligent) is not shown merely by proof that the defendant's act injured the plaintiff. Hence, as in other cases (except the carriers) the burden of proof does not change merely because, under the scintilla rule, the defendant is not entitled to the affirmative charge.

Whatever might be said of the *Lawson* opinion, supra, is somewhat clarified by its author in Louisville & N. Ry. Co. v. Glick, 214 Ala. 303, 107 So. 453. There we find:

"* * * It was for the jury, not the court, to draw the inference necessary for plaintiff's recovery, and the general affirmative charge for plaintiff was erroneously given. * * *"

From the oft-cited opinion in Sweeney v. Erving,[10] 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815, we quote:

"In our opinion, *res ipsa loquitur* means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. *Res ipsa loquitur*, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff."

Under our modes of jury instruction, in civil cases, if there is a scintilla for the plaintiff, the jury gets the case to ascertain whether or not they are "reasonably satisfied" from all the evidence that the defendant has been negligent to the plaintiff's loss and damage. See Stanek v. Houston, Fla.App., 165 So.2d 825.

Mrs. Aldridge's seeing the dust and rocks which accompanied a blast which shook the house and knocked bricks loose, etc., was a specific act which would tend to support the verdict when considered with the evidence of severity, frequency and duration of the other blasts. Complaint was made to the defendant's superintendent, one of its witnesses admitting being told to ease off in the shots.

In the test of Langley Bus Co. v. Messer, supra, the proof advanced by appellant was disputed and not free from adverse inferences. Sinclair v. Taylor, 27 Ala.App. 418, 173 So. 878.

The judgment below will be

Affirmed.

10. Compare the thesis of Shain, Res Ipsa Loquitur, that the *Sweeney* statement is wrong; that res ipsa is a substantive rule of law (not of evidence) which works to shift the burden of proof. Also, Anno. 53 A.L.R. 1494, and 167 A.L.R. 658.