RAYMOND BAYER AND WIFE, CATHERINE BAYER v. NELLO L. TEER CO.

(Filed 21 March, 1962.)

**1. Waters and Water Courses § 2—**

The common law rule that the owner of land, in the absence of malice or negligence or any contractual or statutory restriction, has the absolute right to intercept and use percolating waters has been modified by the "reasonable use" rule under which the land owner may use percolating water for any use which is reasonable and legitimate in the natural enjoyment or improvement of his own land, provided he does not waste the water, use it for purposes unconnected with the improvement or enjoyment of his land, or act maliciously or negligently.

**2. Trial § 21—**

On motion to nonsuit, plaintiffs' evidence is to be taken as true and considered in the light most favorable to them, giving them the benefit of every reasonable inference to be drawn therefrom, and defendant's evidence which is favorable to plaintiffs or tends to explain and make clear plaintiffs' evidence may be considered, but defendant's evidence which tends to contradict or impeach plaintiffs' evidence is to be disregarded.

**3. Waters and Water Courses § 2— Pumping of water necessary in reasonable operation of rock quarry held not unreasonable interference with percolating waters.**

In plaintiffs' action to recover damages for the diminution and contamination of their well water resulting from defendant's quarry operations, nonsuit is properly entered on evidence tending to show that defendant was operating its rock quarry in accordance with accepted standards and pumped no more water from the bottom of its open pit than was necessary in the beneficial and useful operation of the quarry, there being no evidence of malice or negligence on the part of defendant or of any intentional contamination of or interference with plaintiffs' supply of percolating waters, and the fact that the water pumped from the pit was not used by defendant does not constitute waste of the water within the reasonable use doctrine.

SHARP, J., took no part in the consideration or decision of this case.

APPEAL by defendant from *Bone, J.,* 2 October 1961 Term of CRAVEN.

Action *ex delicto* to recover damages to plaintiffs' property allegedly caused by defendant's wrongful and unreasonable and negligent acts in its operation of its rock quarry, in four respects, which are set forth in the issues submitted to the jury. These issues, with the jury's answers thereto, are as follows:

"1. Have plaintiffs been damaged by the defendant's negligent use of dynamite and other explosives, as alleged in the Complaint?

"ANSWER: No.

"2. If so, in what amount?

"ANSWER: _____

"3. Has plaintiffs' land been damaged by the wrongful acts of the defendant in wrongfully diverting or collecting surface waters and discharging them upon the lands of the plaintiffs, as alleged in the Complaint?

"ANSWER: Yes.

"4. If so, in what amount?

"ANSWER: $200.00.

"5. Has plaintiffs' land been damaged by the wrongful act of the defendant in causing dust and dirt to be wrongfully discharged upon the lands and property of the plaintiffs, as alleged in the Complaint?

"ANSWER: No.

"6. If so, in what amount?

"ANSWER: _____

"7. Did the defendant wrongfully and unreasonably remove such excessive amounts of percolating water in connection with the quarrying operation as to contaminate the plaintiffs' water supply, as alleged in the Complaint?

"ANSWER: Yes.

"8. If so, in what amount were the plaintiffs damaged thereby?

"ANSWER: $2,000.00."

From a judgment entered upon the verdict that plaintiffs recover $2,200.00 and the costs, defendant appeals.

*C. B. Nye by C. E. H., Jr., and Lee and Hancock by C. E. Hancock, Jr., for defendant appellant.*

*Ward and Tucker by J. E. Tucker, and Whitehurst and Henderson by David S. Henderson for plaintiff appellees.*

PARKER, J.   Defendant assigns as error the denial by the trial court of its motion for judgment of nonsuit as to any cause of action alleged by plaintiffs for the diminution and contamination of their water supply by defendant, which motion was made at the close of plaintiffs' evidence, and renewed at the close of all the evidence.

Defendant in its brief makes no contention that there was any error in the trial so far as the jury awarded $200.00 damages to plaintiffs for the defendant's wrongfully diverting or collecting surface waters and discharging them upon their lands, and makes no contention in its brief that they are not entitled to judgment against it for that amount. In fact, it candidly conceded such in the oral argument before us.

Plaintiffs own a lot of land in Craven County situate on a paved road, between the road and Brice's Creek. Its frontage on the road is about 100 feet, on the creek about 70 feet, and its depth is about 70 feet. Plaintiffs purchased this lot about 1947 for $150.00, plus a used washing machine. About that time they bought three Dallas Huts for $100.00, which they moved to this lot, and put together with many improvements, and made a home. They first put down a shallow well, which was not satisfactory, and then put down an 80-foot well, which gave good water. After prior occupation of this house by other members of the family, plaintiffs moved into it in the autumn of 1958.

By deed dated 27 August 1957 defendant acquired a tract of land adjacent to plaintiffs' lot and about 8 or 10 feet from plaintiffs' house. In the same area it has a property interest in other lands upon which it operated a rock quarry. The distance from plaintiffs' lot to this rock quarry is about 1000 feet. Adjacent to plaintiffs' lot defendant

erected a large ramp for use in bringing rock and other material from its quarry to Brice's Creek for transportation by water.

Plaintiffs allege in paragraph 6 of their complaint:

"That in connection with said operations [of its quarry rights], the said Nello L. Teer Company has caused to be dug a deep well or wells, the water from which is being used in connection with its operations; that it has used such unreasonable and excessive amounts of water from the usual subterranean channels, which furnish water for the area and particularly for the plaintiffs' lands and uses, that the natural flow of said water has become so depleted that a great scarcity of water is available to the plaintiffs' pump for use in their home, and salt and other minerals not theretofore present in the water have come into the well, making the same unuseable for human consumption, and the water also contains materials that make it unuseable for laundry, for cleaning, or for other household uses of water, and it is wholly unfit for bathing or general sanitary purposes."

After the complaint was filed plaintiffs, with leave of court, amended their complaint by adding to paragraph 6 the following:

"That the defendant Nello L. Teer Company has elected, without regard to the plaintiffs' rights and in disregard of the effect upon plaintiffs' property and with the knowledge of such effect, to pump the water from said mine or wells away from its natural flow, and has diverted it from any use in its operations, at the same time depriving the plaintiffs of their right to use said water, and the same was done willfully and maliciously and in reckless disregard of the plaintiffs' rights."

The above allegations are denied by the defendant in its answer and in its amendment to its answer.

Plaintiffs' evidence relevant to defendant's motion for judgment of nonsuit is as follows:

Maurice Odel Caton, a sanitary engineer with the North Carolina State Board of Health, on an unspecified date went to defendant's rock quarry. He saw some large pumps operating continuously pumping water from the bottom of the quarry pit to a stream. According to his observation the rock quarry was not otherwise in operation.

C. W. Hodges, Jr., a drainage contractor, testified for plaintiffs:

"I'm familiar with open pit mining and I have seen several carrying on. I am familiar with the open pit mining operations of the Nello Teer Company near Brice's creek. . . . At the extreme

end of the pit, I would say that hole was approximately 60 to 70 feet deep. They had a pump there; how deep that was I couldn't say. They pumped a great quantity of water out of the pit; *it was necessary for the operation.* I would say they would have a minimum pumping capacity in there of about 5,000 or 6,000 gallons per minute." Emphasis ours.

Clyde Needham testified for plaintiffs:

"The depth of the quarry is 40 feet. . . . I have seen the quarry in operation pumping water. . . .The water was being pumped directly out in and into this branch I referred to, and that in turn dumped into Brice's Creek. The water was in no way, shape or form being run through any Teer operation that you could see. . . . The Teer Company started operations at its quarry over on the Brice's Creek in January of 1957."

Albert R. Bell, who was found by the trial court to be an expert civil engineer with experience in the field of water supply, testified for plaintiffs on direct examination:

"If water were continuously pumped at a rate of at least 5,000 gallons per minute, during 1957 and for a period of 90 days from an excavation 40 feet below the level of Brice's Creek and located within 1,000 feet of the Bayer well, which is approximately 80 feet below the level of Brice's Creek, and was pumped with a suction type pump, and if the Bayer well is located approximately 60 feet from Brice's Creek, on the same side of said creek as the excavation, it is my opinion that that would cause the Bayer well to salt up. In the Coastal Plains section of North Carolina you have brackish waters abutting in your creeks, and you have salt water underlying the fresh water."

He testified on cross-examination:

"I have visited the quarry site of the Nello Teer Company; I have also visited the quarry site of Superior Stone in this same general area. I generally noticed the operations and how they were operating the quarry on my visits to the Teer quarry. *I found that the Teer Company was very definitely operating its quarry by accepted good standards.* . . . Both the Teer Company and Superior Stone were operating by pumping water out of the quarry. . . . *I found the Nello Teer quarry to be operating in accordance with the best practices of open pit mining.* . . . In my opinion, Mr. Bayer could probably obtain water by drilling a well in a new location on his property at an expense of about $3.00 a foot for

the drilling and the pipes, casing, or $240 for a well 80 feet deep. . . . The Teer Company is not pumping water from its quarry as of this date; I would say it has been over a year since they have pumped water. Dynamite is not required in the type of operation now being used and water is not being pumped from the quarry in the manner heretofore described, at the present time." Emphasis ours.

He testified on redirect examination:

"The Teer Company was not using the water being pumped out; the water was being wasted. *It was to de-water the quarry to enable them to operate.* The water was being disposed of through a fluent ditch running into the creek." Emphasis ours.

He testified on recross examination:

"He was talking about pumping the water out of the pit; *I never saw the Teer operations pumping any more water than it was necessary for an efficient operation.*" Emphasis ours.

Plaintiffs' evidence further shows that after defendant began pumping large quantities of water from its rock quarry the water from their well became salty, it had a petroleum or kerosene odor, and was not drinkable or useable, and as a result the value of their property was seriously impaired.

Defendant's evidence in respect to its pumping water from its rock quarry is as follows:

J. T. Carter, Jr., general foreman of defendant, testified:

"The Teer Company did not at any time pump any water out of the pit that was not necessary so that it could conduct operations normally. We pumped the amount of water that was necessary to get into the bottom of the pit to load the stone and to get it out. . . . The first week of January, 1959, was the last time that Nello Teer Company has used any explosives. The last part of January, 1959, was the last time it's pumped any water out of the pit for the purpose of keeping the level of the water lower. . . . We do not need dynamite in the type operations being conducted now. The pumps that we used to use for pumping the water out of the pit are no longer located in the area; they have been sent to various locations; the platform is not even there any longer; we don't need them any more. The type of operations we were conducting there in 1957 and 1958 were a standard type of open mining operations."

Hugh H. Byrd, defendant's superintendent in charge of the New Bern area, testified:

> "We ceased the dynamiting and the pumping of water on the property in January 1959. We changed the method of operation because the operation was using a method which was too expensive to remain in competition."

All the evidence in the case is, and the theory of the trial below was, that we are concerned here with subterranean waters, which are percolating waters, and not a subterranean stream or streams. As to the distinction between the two classes of subterranean waters see *Jones v. Loan Association*, 252 N.C. 626, 114 S.E. 2d 638.

The principle underlying the English or common law doctrine governing the use of percolating waters is that the owner of the soil owns all that lies beneath the surface, and, at least in the absence of malice or of negligence, or of any contractual or statutory restriction, has the absolute right to intercept the water before it leaves his premises and make whatever use of it he pleases, regardless of the effect that such use may have on an adjoining or a lower proprietor through whose land the water, in its natural course, would filtrate, percolate or flow. Under this doctrine such inconvenience to a neighbor falls within the description of *damnum absque injuria*, which cannot become the ground of an action. This doctrine was first applied to percolating waters in *Acton v. Blundell*, 12 Meeson and Welby's Reports 324 (1843), 152 English Reprint 1223, still the leading case on this subject, which held "the owner of land through which water flows in a subterraneous course, has no right or interest in it which will enable him to maintain an action against a landowner, who, in carrying on mining operations in his own land in the usual manner, drains away the water from the land of the first-mentioned owner, and lays his well dry." This rule, which is still the rule in England, was followed in a majority of the early decisions in this country. *Jones v. Loan Association, supra; Rouse v. City of Kinston*, 188 N.C. 1, 123 S.E. 482, 35 A.L.R. 1203; 56 Am. Jur., Waters, sec. 113; 93 C.J.S., Waters, pp. 770-1; Anno. 29 A.L.R. 2d 1358-1361, 1366-1368.

Many States, including North Carolina *(Jones v. Loan Association, supra; Rouse v. City of Kinston, supra)*, have since modified or rejected the English or common law rule in favor of what has become known generally as the American doctrine of "reasonable use" and it seems the general trend of recent decisions in many if not most of the States of this country is in favor of such rule and away from the English or common law rule. Annos. 29 A.L.R. 2d 1361-1364, 109 A.L.R. 399, 55 A.L.R. 1398; 56 Am. Jur., Waters, sec. 114; 93 C.J.S.,

Waters, 771-773, in all of which a great number of these cases are cited.

In *Rouse v. City of Kinston, supra,* the Court said: "We think the American rule, adopted in most of the States where this question has arisen, the 'reasonable use' of percolating water, the correct rule."

A clear and accurate statement of the American rule of "reasonable use" is set forth in *Sloss-Sheffield Steel and Iron Co. v. Wilkes,* 231 Ala. 511, 165 So. 764, 109 A.L.R. 385, reaffirmed on subsequent appeal 236 Ala. 173, 181 So. 276:

> "But this early rule of the common law has given way to the doctrine of 'reasonable use,' by which the landowner is said to have the right only to a reasonable and beneficial use of the waters upon the land or its percolations or to some useful purpose connected with his occupation and enjoyment. The 'reasonable use' theory does not prevent the proper consumption of such waters in agriculture, manufacturing, irrigation, or otherwise, nor the development of the land for mining and the like, although the underground waters of neighboring properties may be thus interfered with or diverted. He may consume it, but he must not waste it to the injury of others. He may pump or draw or drain such waters without liability to his neighboring landowners, when it is proper for the natural and legitimate use or improvement of his own land, but not in an unreasonable manner to force and increase the flow to divert them to some use disconnected with such improvement and enjoyment whereby the flow of waters or their percolation under the lands of others are destroyed or diminished."

*Evans v. City of Seattle,* 182 Wash. 450, 47 P. 2d 984, had a factual situation almost similar to the instant case. Six suits by Andrew C. Evans and wife and others against the City of Seattle were consolidated. From a judgment for plaintiffs, the defendant appealed. The Court held that the city owning a gravel pit was not liable for diverting percolating waters from lower adjacent lands by drainage ditch, where drainage was for purpose of extracting gravel and property was valuable for no other purpose. In its opinion the Court said:

> "The American courts have adopted the rule of reasonable use which limits the right of the landowner to such amount of the percolating waters under his land as may be necessary for some useful purpose, or such as it may be necessary for him to divert in order to make reasonable use of his land. . . .
>
> "The fact is well established that the appellant city was making a reasonable use of its own property, and that the draining of the gravel pit was for the reasonable and proper purpose of ex-

tracting the gravel for use. Apparently, the gravel pit property was valuable for no other purpose than that of producing gravel, and the city, being the owner, had, we think, under the reasonable use and correlative rights doctrine, a legal right to so drain the gravel pit as to make the product thereof available for use without thereby incurring any liability to others.

"Reversed, with directions to dismiss the consolidated action."

*N. M. Long & Co. v. Cannon-Papanikolas Const. Co.*, 9 Utah 2d 307, 343 P. 2d 1100, (17 Sept. 1959), was a suit for damages and for injunctive relief based upon claim that residential developers in draining and conditioning their land had drained water from adjoining lands of plaintiffs. Defendants are in the business of developing and constructing residential subdivisions. In 1953 and 1954 they acquired about 92 acres of land in the locality of plaintiffs' properties. The greater portion of defendants' land being swampy, they caused drains to be installed to lower the water table to condition the land for their purpose. It is this which plaintiffs claim had the effect of draining the water from their lands and depleting their water sources. The district court rendered judgment for defendants and plaintiffs appealed. The Supreme Court held the defendants were not obliged to anticipate that drainage of their land, a greater portion of which had been swampy, would result in reducing waters to other tract owners, and defendants did not have to let their land remain in swampy condition for purpose of protecting underground waters of adjoining lands, and affirmed the judgment of the trial court.

In *Sycamore Coal Co. v. Stanley*, 292 Ky. 168, 166 S.W. 2d 293, Lemuel S. Stanley and Cordelia Stanley brought an action against Sycamore Coal Co. to recover damages for the alleged destruction of a well or spring on their land. There was a verdict for the Stanleys in the sum of $475.00, and the Coal Co. filed a motion for an appeal. The Stanley farm adjoins appellant's land. Appellant drilled a core hole 4 inches in diameter on its land about 60 feet from a well on the Stanleys' land which had been drilled to a depth of 28 feet. The core drilling by appellant was for the purpose of determining the thickness and quality of coal seams underlying its land. When the drill reached a depth of 60 feet the water in the Stanleys' well disappeared. Appellant later filled the hole with cement, and the water rose in the Stanleys' well to a depth of about 14 inches. Theretofore it had stood at 4½ feet. There was no evidence of a subterranean stream flowing in a known and defined channel. The Court said in its opinion:

"The owner of land when putting it to a legitimate use is not liable to the owner of adjoining lands for injuries to wells or

springs fed by hidden underground streams flowing in unknown channels. . . . According to this rule [the American or reasonable use rule], the right of a landowner to subterranean percolating waters is limited to a reasonable and beneficial use of the waters under his land, and he has no right to waste them, whether through malice or indifference, if, by such waste, he injures a neighboring landowner. 27 R.C.L., pages 1171-1178; Annotations in 109 A.L.R. 395; *Kinnaird v. Standard Oil Company,* 89 Ky. 468, 12 S.W. 937, 7 L.R.A. 451, 25 Am. St. Rep. 545. Here, the appellant was using its land in a legitimate manner, and it drilled the hole for a necessary and useful purpose. There is nothing in the proof tending to show that the injury to the appellees' well should have been anticipated by appellant, and there is no question of malice or waste. At the conclusion of the evidence the court should have sustained appellant's motion for a directed verdict in its favor."

In *United Fuel Gas Co. v. Sawyers, Court of Appeals of Kentucky,* 19 June 1953, 259 S.W. 2d 466, the Court held that where the Gas Co., in a legitimate manner, drilled a gas well on its own property, and there was no proof that defendant should have anticipated injury to well on the Sawyers' adjoining land, nor any question of malice or waste on the part of the Gas Co., contamination of Sawyers' well, even if causally connected to the drilling operation, was *damnum absque injuria.* The Court stated "The decision is confined to the pollution of percolating waters."

"Mining operations, being a reasonable use of land, do not, in general make one carrying on such operations liable because percolating waters are intercepted or drawn away so as to destroy or injure springs or wells belonging to the owner of the surface or of adjoining lands. There are some decisions to the contrary, which adhere to the doctrine of correlative rights in percolating waters." 36 Am. Jur., Mines and Minerals, sec. 193. To the same effect 58 C.J.S., Mines and Minerals, sec. 274. In section 274, page 776, of C.J.S., this in addition is stated: "Where the right to mine is separated from the ownership of the surface, the owner of the minerals is not liable to the surface owner because of the incidental loss of waters supplying springs or wells when caused by the ordinary working of the mine. . . ." This section 274 is restricted to the flow of percolating waters.

In the case of a well sunk by a proprietor in his own land, the percolating waters which feed it from a neighboring soil do not flow openly in the sight of the neighboring proprietor, but through the earth beneath its surface. No man can tell what changes these underground sources of percolating waters have undergone in the progress of time. It

may well be, that it is only yesterday, that they first took the course and direction which enabled them to supply the well. "A person who obstructs the flow of a known subterranean stream, ordinarily knows to a substantial certainty that he will prevent the water from flowing as it naturally would, and his obstruction is therefore intentional. On the other hand, a person who obstructs the flow of mere percolating waters ordinarily does not know to a substantial certainty what the consequences will be, and the harm which does result is not intentional. Restatement of the Law of Torts, Vol. IV, p. 333." *Jones v. Loan Association, supra.*

In passing upon defendant's motion for judgment of involuntary nonsuit, it is settled law in this jurisdiction that the plaintiffs' evidence is taken as true, and they are entitled to have their evidence considered in the light most favorable to them, and to have the benefit of every reasonable inference to be drawn therefrom. So much of defendant's evidence as is favorable to plaintiffs or tends to explain or make clear plaintiffs' evidence may be considered, but that which tends to contradict or impeach plaintiffs' evidence is to be disregarded. *Bundy v. Powell,* 229 N.C. 707, 51 S.E. 2d 307; *Polansky v. Ins. Ass'n.,* 238 N.C. 427, 78 S.E. 2d 213; *Bridges v. Graham,* 246 N.C. 371, 98 S.E. 2d 492.

All of plaintiffs' evidence, and any evidence of defendant favorable to them, show these facts: Defendant was mining or taking rock from its rock quarry "in accordance with the best practices of open pit mining," or in other words "by accepted good standards," and that it pumped no more percolating waters therefrom than "was necessary for the operation." It is true that Albert R. Bell, found by the trial court to be an expert civil engineer with experience in the field of water supply, testified on redirect examination for plaintiff "the water was being wasted," but immediately thereafter he testified, "it was to de-water the quarry to enable them to operate." Defendant was using its rock quarry in a legitimate and natural manner and making the only use of it for which it was reasonably adapted, and was pumping no more percolating waters therefrom than was necessary for its beneficial and useful operation, and under those circumstances it was not required by law to use the percolating waters, and the fact it did not use it under those circumstances does not make it chargeable with waste. There is here no evidence on defendant's part of malice, or of negligence, or of waste, or of an intentional contamination or interference with plaintiffs' supply of percolating waters to their well. Defendant was not required to let its rock quarry remain unworked because of percolating waters in order to protect the underground percolating waters on plaintiffs' land. The fact that defendant has changed its

operations of its rock quarry, perhaps because of new processes or of new conditions there, does not mean its former pumping of percolating waters therefrom was unreasonable or negligent or constituted waste. There is no evidence that defendant was making an unreasonable use or waste of underground percolating waters. Defendant's motion for judgment of involuntary nonsuit made at the close of all the evidence was improperly overruled.

*Rouse v. City of Kinston, supra,* is clearly distinguishable. In that case the City of Kinston dug artesian wells and conveyed percolating waters thereby obtained to the City for sale to its inhabitants for drinking and sanitary purposes and fire protection. *Jones v. Loan Association, supra,* is also clearly distinguishable, in that plaintiffs' evidence tended to show a negligent obstruction of percolating waters.

When this opinion is certified down to the superior court, that court will vacate the answers to the seventh and eighth issues and vacate the judgment that plaintiffs recover $2,200.00 from the defendant, and enter judgment sustaining defendant's demurrer made at the close of all the evidence as to any cause of action alleged by plaintiffs for the diminution and contamination of their water supply from percolating waters to their well, and further enter judgment that plaintiffs have and recover from defendant $200.00 and the costs.

Affirmed in part.

Reversed in part.

SHARP, J., took no part in the consideration or decision of this case.