FINLEY ET UX. v. TEETER STONE, INC.

[No. 355, September Term, 1967.]

*Decided November 19, 1968.*

The cause was argued before HAMMOND, C. J., and BARNES, McWILLIAMS, SINGLEY and SMITH, JJ.

*Carl H. Lehmann, Jr.,* for appellants.

*Richard A. Reid,* with whom were *Royston, Mueller, Thomas & McLean, Charles O. Fisher* and *Walsh & Fisher* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

This appeal involves a claim for damages alleged to have resulted to at least 35 acres (and possibly 57 acres) of improved farmland in Carroll County. The land in question is owned and occupied by the appellants, George M. Finley and Elizabeth Englar Finley, his wife, (Finleys), who claim that the quarrying operations of the appellee, Teeter Stone, Inc. (Teeter) on adjacent land has resulted in the Finleys' land being dewatered, thereby causing damage by reason of substantial subsidence. The Circuit Court for Carroll County (Macgill, C. J.), at the end of the case presented by the plaintiffs, the Finleys, directed a verdict for the defendant, Teeter, and granted a judgment for costs in Teeter's favor. From this decision, the Finleys have taken a timely appeal.

The facts are presented by an agreed statement of the case pursuant to Maryland Rule 826 g and are not in dispute.

The Finleys own and occupy a farm of 282.44 acres located on Stone Chapel Road in the Wakefield Valley in the New Windsor and Westminster Election District of Carroll County. Teeter owns a large tract of land located immediately adjacent to the southwest line of the Finley land. Since 1958 Teeter has operated a stone quarry on its land and conducts stone crushing operations and other related activities directly connected with the mining and refining of stone. Teeter's land consists of approximately 100 acres and is roughly rectangular in size. Since beginning its quarrying operations in 1958 it has gradually enlarged its quarry pit so that it now extends virtually from border to border of its tract and to a depth of some 80 feet. In

the course of conducting its quarrying operations it is necessary for Teeter to keep its excavation dry by continually pumping out the water that accumulates in its quarry pit.

The testimony of James A. Humphreyville, a well qualified consulting geologist, was presented on behalf of the Finleys and is not contradicted in this case. His testimony established that the rock formation into which the quarry pit was sunk was limestone which has been named Wakefield Marble. The stone which is quarried is used for road stone and other purposes.

By boring operations on the Finley property, the consideration of other data and the exposure in the Teeter quarry, the extreme differential solution and erosion in the form of irregularly shaped pinnacles and spires is demonstrated. In the area under consideration the striking dipping nature of the rock formation has also contributed to the saw-toothed top of the rock profile. In addition, the rock mass is characterized by jointing, fracturing, faulting and voids resulting from this saw-toothed top of the rock profile.

The geologist observed that sink holes related to limestone areas generally and to the Wakefield Valley specifically are not unusual. He demonstrated, however, that the likelihood of the occurrence of sink holes in the 35 acres of the Finley land, now subject to subsidence, in the absence of the removal of water, was negligible. This area was approximately five feet superior to the level of the natural water table. Inasmuch as the land in question was at the low point of the local portion of the Valley, the movement of ground water in its natural state was slow but the excavation of the quarry and the pumping of water by Teeter caused the velocity of the flow toward the quarry sump to be substantially increased. This action resulted in the dislodging of soils forming the roofs of the solution channels as well as causing soils from the clay mantle to be removed by percolation and flow, thus leaving voids causing subterranean and surface collapse.

The rock, itself, is impervious, but because of the cracks, solution channels (most of them interconnected), cavities, joints and fractures, the formation as a whole is highly permeable by water. The pumping from the quarry has resulted in a "draw-down" of the water table so that there is a shallow "cone of

depression" reaching under the Finley land. This lowering of the water table causes the water support for the saturated clay to be removed so that the clay in the plugs on the solution channels begins to move out and is carried away by the water into lower positions on the solution channels. In other situations the dropping of the water table may not directly wash away the clay plugs but allows the clay plugs to desiccate as they are no longer in contact with water. As the overlying mantle of soils over the bed rock in this area varies from 17 to 30 feet, a vault, unsupported by earth, is then formed and may be three, four or even ten feet high. The diameter may be up to 15 feet and when the rain comes in the late winter or early spring, the sudden rush of water infiltrates and saturates this clay and precipitates a series of collapses. These propagate upwards until the surface of the land caves in and causes sink holes. This has resulted in the sink holes on the 35 acres of the Finley land which were the basis of the study and principal testimony of the geologist in this case. The photographs introduced into evidence indicated the severe nature of the sink holes which had occurred on the 35 acre tract. There was evidence of a qualified real estate appraiser that the land of the Finleys had been substantially damaged as a result of the sink holes.

There was no contention by the Finleys that Teeter interfered with any underground bodies or streams of water flowing in known and defined or ascertainable channels or courses as opposed to percolating waters. Nor was there any contention by the Finleys that Teeter had acted in a negligent manner in the operation of its quarry, including the necessary pumping of water from it. All of the subsidence occurred entirely on the Finley land. Teeter's excavations did not cause any loss of lateral support of any of the Finley land immediately adjacent to the line of the quarry property. As already indicated, the trial court upon Teeter's motion, and after considering trial memoranda of the parties, directed a verdict for Teeter at the end of the Finleys' case because in its opinion the Finleys were not entitled to recover damages from Teeter as a matter of law. The trial court filed a well considered written opinion in denying the motion of the Finleys for a new trial, stating the reasons for its action. We agree with the conclusion of Chief Judge Macgill and will affirm the judgment for Teeter for costs.

As the present case involves the use of subterranean water, we will now consider the law applicable to such waters.

Subterranean waters are generally considered to be of two distinct types: (1) underground streams and (2) percolating waters. To be classified as an underground stream, the water must flow in a definite and fixed channel whose existence and location is either known or may be ascertained from indications on the surface of the land or by other means without subsurface excavations to determine such existence and location. See *Washington County Water Co. v. Garver*, 91 Md. 398, 407-09, 46 A. 979, 981 (1900). See also *Clinchfield Coal Corp. v. Compton*, 148 Va. 437, 447-48, 139 S. E. 308, 311, 55 A.L.R. 1376, 1381 (1927); *Evans v. City of Seattle*, 182 Wash. 450, 453-54, 47 P. 2d 984, 985 (1935); 56 Am. Jur. *Waters* § 108 at 591 (1945); 93 C.J.S. *Waters* § 86 at 761 (1956).

Percolating waters, on the other hand, are those "which ooze, seep or filter through soil beneath the surface, without a defined channel, or in a course that is unknown and not discoverable from surface indications without excavation for that purpose. The fact that they may, in their underground course, at places come together so as to form veins or rivulets does not destroy their character as percolating waters." *Clinchfield Coal Corp. v. Compton, supra*, 148 Va. at 446, 139 S. E. at 311, 55 A.L.R. at 1381; see also *United Fuel Gas Co. v. Sawyers*, 259 S.W.2d 466, 467, 38 A.L.R.2d 1261, 1263-64 (Ky. 1953); *Canada v. City of Shawnee*, 179 Okla. 53, 54, 64 P. 2d 694, 696 (1936); *C & W Coal Corp. v. Salyer*, 200 Va. 18, 22-23, 104 S.E.2d 50, 53-54 (1958); 56 Am. Jur. *Waters* § 111 at 593 (1945).

Unless it can be shown that the "underground water flows in a defined and known channel it will be presumed to be percolating water." *Clinchfield Coal Corp. v. Compton, supra*, 148 Va. at 448, 139 S. E. at 311-12, 55 A.L.R. at 1381-82. Accord, *Western Maryland R. R. Co. v. Martin*, 110 Md. 554, 566-67, 73 A. 267, 272 (1909). See generally *McGowan v. U. S.*, 206 F. Supp. 439, 442 (D. Mont. 1962); *Canada v. City of Shawnee, supra*, 179 Okla. at 54, 64 P. 2d at 696; 93 C.J.S. *Waters* § 87 at 762 (1956). While normally the use of underground streams is governed by the same law as applies to those waters

flowing in defined and fixed channels above the surface, see e.g., *Sycamore Coal Co. v. Stanley,* 292 Ky. 168, 166 S.W.2d 293 (1942); *McGowan v. U. S., supra,* 206 F. Supp. at 442; see generally 93 C.J.S. *Waters* § 89 at 763 (1956); 56 Am. Jur. *Waters* § 109 at 591 (1945), a separate and distinct body of law has developed governing the use of percolating waters.

In view of the agreed statement of facts, already mentioned, as well as the answers to interrogatories by the Finleys, together with the evidence in the lower court, it is clear that there has been no suggestion that the waters with which we are concerned are anything other than percolating.

There are two basic lines of authority applicable to the use of percolating waters. The first is known as the English Rule, and was first firmly established in England by the decision in *Acton v. Blundell,* 12 Messon and Welsby's Report 324, 152 Eng. Rep. 1223 (1843). This case involved an action for damages by a landowner whose well had allegedly been made dry as a result of the activities of an adjoining landowner (the defendant) who in the normal operation of his mine drained away percolating water. Cowling, as counsel for the plaintiff, urged the Court to apply the maxim *sic utere tuo ut alienum non laedas,* but the Court held that since the water involved was not a river or flowing stream, but percolating water, the landowner could apply it for any purpose he pleased. Lord Chief Justice Tindal stated, for the Court:

> "[W]e think the present case, for the reasons above given, is not to be governed by the law which applied to rivers and flowing streams, but that it rather falls within that principle, which gives to the owner of the soil all that lies beneath his surface; that the land immediately below is his property, whether it is solid rock, or porous ground, or venous earth, or part soil, part water; that the person who owns the surface may dig therein, and apply all that is there found to his own purposes at his free will and pleasure; and that if, in the exercise of such right, he intercepts or drains off the water collected from underground springs in his neighbour's well, this inconvenience to his neighbour

falls within the description of damnum absque injuria, which cannot become the ground of an action." (12 Messon and Welsby's Report at 354, 152 Eng. Rep. at 1235.)

Thus, under the English Rule, the owner of the freehold was deemed to own all of the percolating waters beneath the surface of the land as he owned the soil and minerals beneath the surface of the land and the air and sky above the surface—an application of the maxim *cujus est solum, ejus est usque ad coelum et ad inferos*. The English Rule is sometimes referred to as the "Absolute Ownership Rule," as the owner of the surface of the land had the absolute right to intercept underground percolating water before it left his property for whatever purpose he pleased and without regard to the effect of such interception on the owner of neighboring land.

Although there was possibly some encroachment on the concept of "absolute ownership" in *Dickinson v. Grand Junction Canal* (1852) 7 Ex. 282, 21 L.J.Ex. 241, the doctrine established in *Acton v. Blundell* was reaffirmed with full vigor in *Chasemore v. Richards* (1859) 7 H.L.C. 349, 29 L.J.Ex. 81 in which it was held that a landowner and mill owner had no right to the use of a stream or a well supplied by percolating water against an adjoining landowner whose extensive well operations caused the loss of such use and even though the plaintiff claimed a prescriptive right resulting from some 60 years of use and the defendant's well operations were supplying water to the inhabitants of a large district and thus not merely serving the defendant's land. The doctrine of "absolute ownership" was also reaffirmed in *English v. Metropolitan Water Board* [1907] 1 K. B. 588, 76 L.J.K.B. 361 where the plaintiff claimed that the defendant's pumping station and water operations caused the subsoil water level to fall as a result of which the plaintiff's pools were drained, rendering them worthless as spawning and fishing grounds and for the cultivation of watercress. The defendant was pumping as much as 1,000,000 gallons of water a day. The King's Bench, in deciding for the defendant, concluded that the subsoil water level was substantially lowered as a result of the defendant's operations but in-

dicated that it was well established that the plaintiff had no right of "support" by water removed by the defendant on its own land. See also *Popplewell v. Hodkinson*, L.R. 4 Ex. 248 (1869), where the English Rule was applied to a case where there was subsidence damage to the plaintiff's land.

In Coulson & Forbes, *Law of Waters*, 221 (6th Ed. 1952), the English Rule is stated to be as follows:

> "[It is] now established on the highest authority that the owner of land containing underground water which percolates by undefined channels and flows to the land of a neighbor has the right to divert or appropriate the percolating water within his own land so as to deprive the neighbor of it; and his right is the same whatever his motive may be, whether *bona fide* to improve his own land, or maliciously to injure his neighbor, or to induce his neighbor to buy him out." [1]

The other line of authority is known as the American Rule,

---

1. (a) As in several American cases, later considered, there may be recovery if the right to *lateral* support is invaded and as a consequence of this invasion sand, earth or quicksand moves from under the plaintiff's land to the defendant's land, and results in the subsidence of the defendant's land and damages buildings thereon. See Jordeson v. Sutton, Southcoates and Drypool Gas Co. [1899] 2 Ch. 217, 68 L.J. Ch. 457, 80 L. T. 815; Trinidad Asphalt Co. *v.* Ambard [1899] A. C. 594, 68 L.J.P.C. 114, 81 L. T. 132; Fletcher *v.* Birkenhead Corp. [1907] 1 K. B. 205, 76 L.J.K.B. 218, 96 L. T. 287. Cf. Elliott *v.* North Eastern Ry. Co. [1863] 10 H.L.Cas. 333, 32 L.J.Ch. 402, 8 L. T. 337; Shelfer *v.* City of London Electric Lighting Co. [1895] 1 Ch. 287; Salt Union, Ltd. *v.* Brunner, Mond & Co. [1906] 2 K. B. 822, 76 L.J.K.B. 55, 95 L. T. 647; and Gill *v.* Westlake [1910] A. C. 197.

(b) Nor have the Acts of Parliament which create various public water systems and provide for compensation to those property owners whose water supply has been adversely affected by the public control impair the authority of the Acton and Chasemore cases in that the English Courts have held that these Acts create no new substantive rights and that the decisions in Acton and Chasemore are still controlling at common law, without impairment by the new statutes. New River Co. *v.* Johnson [1860] 2 El. & Bl. 435, 29 L.J.M.C. 93, 1 L. T. 295; Regina *v.* Metropolitan Board of Works [1863] 3 B. & S. 710, 9 Jur. (N. S.) 1008, 32 L.J.Q.B. 105; and Bradford Corp. *v.* Pickles [1895] A. C. 587.

and was developed in this country more recently, probably as a reaction to the harshness and abuses possible under the English Rule. Under it, in order for a landowner, who, in the course of using his own land, obstructs, diverts, or removes percolating water to the injury of his neighbor, to escape liability, the activity or conduct causing such obstruction, diversion or removal must be a reasonable exercise of his proprietary right, i.e., such an exercise as may be reasonably necessary for some useful or beneficial purpose, generally relating to the land in which the waters are found.[2] See e. g., *Gallerani v. U. S.*, 41 F. Supp. 293 (D. Mass. 1941) (U. S. gov't held to same duty as a private individual) ; *Sycamore Coal Co. v. Stanley, supra; N. M. Long & Co. v. Cannon-Papanikolas Constr. Co.*, 9 Utah 2d 307, 343 P. 2d 1100 (1959). The American Rule is based upon the concept that the surface owner's right to obstruct, divert or remove the percolating waters under the surface of his land shall be exercised in such a way that will not unreasonably injure the exercise of a similar right by the owner of neighboring land—an application of the maxim *sic utere tuo ut alienum non laedas*. The American Rule is sometimes referred as the "Reasonable Use Rule" or the "Correlative Rights Rule."[3]

---

2. Possibly the first case to hold that a rule of reasonable use should apply was Bassett *v.* Salisbury Mfg. Co., 43 N. H. 569 (1862).

3. The terms "Reasonable Use Rule" and "Correlative Rights Rule" are often used interchangeably as synonymous for the "American Rule," but as pointed out in Bristor *v.* Cheatham, 75 Ariz. 227, 236, 255 P. 2d 173, 178 (1953), the doctrines may be considered as distinct.

It would appear, however, that the interpretation given the phrase "Correlative Rights" in California where water, both surface and underground, is of great importance, both public and private, has been construed to include the concept of the use of a "fair share" of the percolating water in a common basin, underground reservoir, or a saturated strata, see City of San Bernardino *v.* City of Riverside, 186 Cal. 7, 15, 198 P. 784, 787 (1921), whereas in States in which the use of water is not of such vital importance the unlimited use of percolating water by the surface owner for some useful or beneficial purpose relating to his land is considered a "reasonable use." In short, the "Correlative Rights Rule" when

There are three excellent and comprehensive annotations in the American Law Reports which consider the English and American decisions applying the two rules, viz., *Subterranean and Percolating Waters; Springs; Wells,* 55 A.L.R. 1385 to 1566 (1928), a supplement to that annotation, 109 A.L.R.2d 395 to 422 (1937) and *Liability for Obstruction or Diversion of Subterranean Waters in Use of Land,* 29 A.L.R.2d 1354 to 1379 (1953). It appears from these annotations and from an analysis of the various cases that while many of the early American decisions followed the English Rule and that a slight majority of the jurisdictions in the United States may still follow this rule, the adoption of the American Rule appears to represent the trend in the American authorities.

Our predecessors, in 1909, considered the two rules in *Western Maryland R. R. Co. v. Martin, supra,* which involved an action at law by a plaintiff landowner against the defendant railroad company which it was claimed had caused a stream to overflow and deposit mud in the plaintiff's spring which, in turn, prevented the normal seepage of underground water into the spring, so that springs appeared in the plaintiff's meadow thereby injuring it. The railroad company requested an instruction that the jury in considering damages should exclude from its consideration any injury from the appearance of springs or water on that part of the plaintiff's land that was not actually submerged by the flooded stream. The trial court declined to grant the instruction. On appeal, in reversing the judgment for the plaintiff, this Court held that the instruction should have been granted. Judge Schmucker, for the Court, stated:

"The authorities generally agree that the presence under land of mere percolating water, not flowing in

---

used in judicial opinions in California appears to be a refinement or possibly an extension of the scope of the reasonableness of the use rather than a departure from the basic principle of reasonable use underlying the American Rule. For an interesting case reviewing the decisions of the Supreme Court of Utah seemingly applying the two rules at various times, see Snake Creek Mining & Tunnel Co. v. Midway Irrigation Co., 260 U. S. 596, 43 S. Ct. 215, 67 L. Ed. 423 (1923), which eventually concluded that the American Rule controlled, giving great weight to the conditions of the area, i. e., the scarcity of water and need for irrigation.

known and well-defined channels, does not ordinarily affect the owners of the land with the same rights and duties as those incident to definite streams. (Citing cases.)

"The decided weight of English and early American authorities supported the doctrine that percolating water was as much a part of the land in which it existed as the soil, stones and minerals therein and was the absolute property of the owner of the land, who might use or deal with it as he pleased without reference to the effect of his action upon adjacent or other lands. (Citing *Acton v. Blundell, supra,* and decisions from New York, New Jersey, California and Minnesota.) The recent American cases show a decided tendency to recede from the earlier view which accorded to the owner of land the unrestrained right of use and disposition of the percolating water contained in it, and to so far modify that doctrine as may be requisite to do substantial justice between the owners of adjacent lands whose peculiarities of location, climate, soil or products are such as to render the application of the earlier rule inequitable. * * *

"Admitting that the correlative rights of adjacent landowners to the use of percolating waters should be exercised in subordination to the maxim *sic utere tuo,* etc., the fact remains, as stated in *Chatfield v. Wilson,* 28 Vt. 49, that 'the secret, changeable and uncontrollable character of underground water in its operation is so diverse and uncertain that we cannot well subject it to the regulations of law nor build upon it a system of rules as is done in the case of surface streams.' We think that in order to hold a defendant in a case like the one now before us liable for an alleged diversion of underground water the fact that such water before its diversion was accustomed to flow, if not in a fixed channel, at least in a uniform direction, should be made plainly to appear. In view of the nature of subterranean water the cases hold with great uniformity that where it does not appear from the evi-

dence that a spring is supplied by any well-defined flowing stream it will be presumed that it is formed by the ordinary percolation of the water in the soil." (Citing cases and texts.) (110 Md. at 565-67, 73 A. at 271-72.)

Although the language of the opinion in *Martin* rather indictates that the Court inclined to the American Rule,[4] we will, like our predecessors in that case, assume without deciding, that the American Rule does apply, as under either the English Rule or the American Rule, the Finleys cannot recover in this case. It is apparent that under the English Rule, Teeter would have the absolute right to use the percolating waters under its land for any purpose without regard to the effect of that use on the Finley land.

Under the American Rule, Teeter would have the right to use the percolating waters under its land for any purpose connected with the legitimate use of its land. It is manifest that the conducting of quarrying operations is normally a legitimate and reasonable use of land, and certainly, in this case, there is no suggestion that such a use is unreasonable or inappropriate, considering all of the circumstances. See *Sycamore Coal Co. v. Stanley; C & W Coal Corp. v. Salyer; Clinchfield Coal Corp. v. Compton,* all *supra; Sloss-Sheffield Steel & Iron Co. v. Wilkes,* 231 Ala. 511, 165 So. 764, 109 A.L.R. 385 (1936), *reaffirmed on subsequent appeal,* 236 Ala. 173, 181 So. 276 (1938); *Dickey v. Honeycutt,* 39 Ala. App. 606, 106 So. 2d 665 (1958), *cert. denied,* 268 Ala. 696, 106 So. 2d 671 (1958). Moreover, it is established that the pumping of large quantities of water, incident to mining or quarrying operations, is both reasonable and necessary. *Bayer v. Nello L. Teer Co.,* 256 N. C. 509, 124 S.E.2d 552 (1962); *Evans v. City of Seattle, supra.*

---

4. It may be observed that this Court has adopted a "reasonableness of use" rule on a case to case basis as a modification of the strict civil law rule in regard to surface waters. See Sainato v. Potter, 222 Md. 263, 267-68, 159 A. 2d 632, 634 (1960) noted in 21 Md. L. Rev. 88-89 (1961); see also Maryland Surface Waters—A Critical Analysis, 18 Md. L. Rev. 61 (1958) and Note, Drainage of Surface Waters Under the Civil Law Rule as Applied in Maryland, 11 Md. L. Rev. 58 (1950).

See also *Associated Constr. Stone Co. v. Pewee Valley Sanitarium & Hosp.*, 376 S.W.2d 316 (Ky. 1963); *Wheatley v. Baugh*, 25 Pa. 528, 64 Am. Dec. 721 (1855); *Behrens v. Scharringhausen*, 22 Ill.App.2d 326, 161 N.E.2d 44 (1959). Indeed, the evidence in the present case, as in the above cases, makes inescapable the conclusion that such procedures are accepted practice in the industry, and strongly suggests that without them, it would be economically, if not absolutely unfeasible for the landowner to put his property to such use.

In *Bayer*, an adjoining landowner sued a quarry owner for damages resulting from a diminution of water in the plaintiff's well because the quarry owner had pumped percolating waters from its quarry pit in order to carry on the operation of the quarry. The Supreme Court of North Carolina adopted the American Rule and held that the quarry owner was not legally responsible for the loss to the plaintiff because the pumping of the percolating waters from its quarry pit was incident to normal quarrying operations and hence a reasonable use of the percolating waters. The Supreme Court of North Carolina quoted with approval from the opinion of the Supreme Court of Alabama in *Sloss-Sheffield Steel & Iron Co. v. Wilkes, supra,* as follows:

> " 'But this early rule of the common law has given way to the doctrine of "reasonable use," by which the landowner is said to have the right only to a reasonable and beneficial use of the waters upon the land or its percolations or to some useful purpose connected with his occupation and enjoyment. The "reasonable use" theory does not prevent the proper consumption of such waters in agriculture, manufacturing, irrigation, or otherwise, nor the development of the land for mining and the like, although the underground waters of neighboring properties may be thus interfered with or diverted. He may consume it, but he must not waste it to the injury of others. He may pump or draw or drain such waters without liability to his neighboring landowners, when it is proper for the natural and legitimate use or improvement of his own land, but not in

an unreasonable manner to force and increase the flow to divert them to some use disconnected with such improvement and enjoyment whereby the flow of waters or their percolation under the lands of others are destroyed or diminished.'" (256 N. C. at 516, 124 S.E.2d at 556-57.)

The general rule is that a landowner engaged in ordinary and usual mining operations is not responsible for damages resulting from the diversion or destruction of the flow of percolating waters. In addition to *Bayer v. Nello L. Teer Co.,* see *Clinchfield Coal Corp. v. Compton; Sycamore Coal Co. v. Stanley and Sloss-Sheffield Steel & Iron Co. v. Wilkes, Dickey v. Honeycutt, C & W Coal Corp. v. Salyer,* all *supra.*

As it is prima facie established that Teeter's use of the percolating waters on its land is a legitimate and reasonable one, it is incumbent upon the Finleys to show that such was unreasonable. There are cases which have indicated that the diversion or destruction of the flow of percolating waters may be unreasonable if the water is being sold for commercial purposes, see e. g., *Koch v. Wick,* 87 So. 2d 47 (Fla. 1956) ; *Rothrauff v. Sinking Spring Water Co.,* 339 Pa. 129, 14 A. 2d 87 (1940) ; *Canada v. City of Shawnee, supra,* or if the water is being unreasonably wasted, see e. g., *City of Pasadena v. City of Alhambra,* 33 Cal. 2d 908, 207 P. 2d 17 (1949) ; *Southwest Engineering Co. v. Ernst,* 79 Ariz. 403, 291 P. 2d 764 (1955) (these cases relied primarily upon the legislative intent expressed in statutes prohibiting the wasting of water). In addition, there are numerous cases which have established that a malicious or negligent use of percolating waters is unreasonable. See generally 93 C.J.S. *Waters* § 93 at 767-72, § 94 at 773 (1956) ; 56 Am. Jur. *Waters* § 114 at 596-99, § 117 at 599-601 (1947). The cases of *Cabot v. Kingman,* 166 Mass. 403, 44 N. E. 344 (1896) ; *N. Y. Cent. R. R. Co. v. Marinucci Bros. & Co., Inc.,* 337 Mass. 469, 149 N.E.2d 680 (1958) ; *Gamer v. Town of Milton,* 346 Mass. 617, 195 N.E.2d 65 (1964), relied upon by the appellants, are examples of a negligent use as the basis of liability.[5]

---

5. We will assume that these cases are to be treated as resting

Inasmuch as there is no contention or proof by the Finleys that there was any negligence by Teeter in its excavation of its quarry or of any waste, malice or sale of percolating waters, or other unreasonable use, Teeter has no liability to the Finleys for damages resulting from Teeter's pumping of percolating waters from its quarry. The injury to the Finleys is *damnum absque injuria.*

The Finleys have argued both to the court below, and before us, that the law relating to the use of percolating waters should not apply, and because the eventual result of Teeter's activities was subsidence of the Finley land, the law relating to the support of land should be dispositive.

In considering the cases relied on by the Finleys, it is important to keep in mind the distinction between *lateral* support and *subjacent* support. "Lateral support" is "the right which soil in its natural state has to support *from land adjoining it."* 1 Am. Jur.2d *Adjoining Landowners* § 37 at 717 (1962) (emphasis supplied). "Subjacent support," on the other hand, is "the support of the surface *by the underlying strata* of the earth (emphasis supplied). *Id.* § 77 at 746. The evidence established that the sink holes on the Finley land resulted from the *downward* movement of the earth. There was no sidewise movement of soil or rock from the Finley land into the Teeter quarry. It is clear that the cases involving the impairment of *lateral* support, relied on by the Finleys, are not apposite. These cases include *Levi v. Schwartz,* 201 Md. 575, 95 A. 2d 322 (1953) ; *Mullan v. Hacker,* 187 Md. 261, 49 A. 2d 640 (1946) ; and *Baltimore & Potomac R. R. Co. v. Reaney,* 42 Md. 117 (1875).

*Farnandis v. Great Northern Ry. Co.,* 41 Wash. 486, 84 P. 18 (1906), although principally concerned with cracks in the earth resulting from blasting, also involved some evidence that the cracks had resulted from the tapping of an underground stream which caused the soil to be carried away, rather than from the diversion of percolating waters.

---

on the law of percolating waters, even though there was evidence in all of them that the defendants were draining out solid matter from under the plaintiffs' land as well as water.

In *Rouse v. City of Kinston,* 188 N. C. 1, 123 S. E. 482 (1924), the Supreme Court of North Carolina adopted the American Rule for North Carolina and held that the removal of percolating waters for sale was not a reasonable use of those waters. It is clear, however, that the pumping of percolating waters by a quarry owner is considered to be a reasonable use of percolating waters in North Carolina. See *Bayer v. Nello L. Teer Co., supra.*

The cases involving the removal of barriers to a stratum of quicksand or of sand also involved a deprivation of lateral support. See *Prete v. Cray,* 49 R. I. 209, 141 A. 609, 59 A.L.R. 1241 (1928) and *Muskatell v. City of Seattle,* 10 Wash. 2d 221, 116 P. 2d 363 (1941).[6]

It is our opinion that there is a vital distinction between all of the cases of lateral support where some substance, which in its natural position is stationary and provides a foundation for the overlying land, is caused to be removed from its position of rest and the present case where a body of naturally moving water is diverted or affected. The fact that some of the cases involved quicksand or other liquid or semi-liquid substances is not persuasive, as it may be assumed that such substances are not normally flowing, shifting, or changing position in response to the vagaries of weather and climatic conditions. Water, on the other hand, whether in defined streams or percolating, is known to flow or move in response to virtually every change in conditions, both natural and man-made. It is primarily because of this dynamic quality that we cannot hold that interference with the support provided by water is subject to the same rules of absolute liability that are imposed on a landowner who deprives his neighbor of the natural support provided by soils and other more solid materials. See *Restatement of Torts* § 818 (1939) which provides: "To the extent that a person is not liable for withdrawing subterranean waters from the land of another, he is not liable for a subsidence of the other's land which is caused by the withdrawal." In Comment b to that sec-

---

6. It should be observed that the Farnandis and Muskatell cases also involved a provision of the Constitution of the State of Washington which prohibited the taking or damaging of private property for public use without the payment of just compensation.

tion, it is explained: "The freedom from liability stated in this Section is restricted to the withdrawal of fluids of which the constituents are preponderantly water, and does not extend to fluids of which the constituents are preponderantly solid matter." We emphasize that we need not decide here whether the result might be different if, in the course of its operations, the defendant had caused substantial amounts of soil or clay to be drawn out from under the plaintiffs' land, or if there had been any evidence of lateral movement of supporting materials from the plaintiffs' land to the defendant's land.

Nor do we believe that there is any issue of subjacent support, within the legal definition of that term, involved in this case. Both *Black's Law Dictionary* and *Bouvier's Law Dictionary* define subjacent support as "the right of land to be supported by the *land* which lies under it." *Black's Law Dictionary* 1593 (4th Ed. 1951); 3 *Bouvier's Law Dictionary* 3189 (3rd Revision 1914). (Emphasis supplied.) Similarly, the Introductory Note to the *Restatement of Torts,* Ch. 39 (1939) defines subjacent support as the situation where "the supported land is above and the supporting land is beneath it." It is our opinion that the right should be so limited, and in the absence of the type of situation where the surface ownership is separated from the subsoil ownership, or where there is an actual encroachment on the land underlying that which is allegedly deprived of support, we do not think there is any question of deprivation of subjacent support. Thus, it has been stated:

> "[A]lthough there may be an absolute duty to the surface owners of the same land in which mining operations are conducted not to cause falls and sinks or cracks in the surface, such duty arises as an incident to that of subjacent support * * *, which does not exist as to adjoining surface landowners. As to them there is no difference between the duty to avoid surface disturbances and that to avoid drainage of percolating water, since the duty of subjacent support is not existant so long as lateral support is not interfered with." (*Sloss-Sheffield Steel & Iron Co. v. Wilkes, supra,* 231 Ala. at 518, 165 So. at 770, 109 A.L.R. at 392.)

See generally 1 Am. Jur.2d *Adjoining Landowners* § 77 at 746 (1962) ; *Restatement of Torts* § 818, *supra*.

It was suggested at the argument by counsel for the Finleys that because of the increase of knowledge in regard to geology and the action and reaction of soil and percolating waters, and in view of the serious and extensive damage suffered by the Finleys by the appearance of the sink holes on their land, an expanded "American Rule" should be adopted by us. There is little question that the Finleys have been gravely injured by the sink holes, and although we are sympathetic with their plight, we are of the opinion that we must adhere to the authorities we have cited. If the public interest requires a change of the law in regard to percolating waters, a remedy lies with the General Assembly where the rights, duties and opinions of those concerned could be fully considered and evaluated.

*Judgment affirmed, the costs to be*
*paid by the appellants.*