This action was brought by three Jefferson County homeowners to recover damages for injury caused to their property by the operation of a neighboring quarry. At the close of plaintiffs' case, the trial court directed a verdict in defendant's favor.[1]
The plaintiffs appealed.
There are occasions when it becomes necessary to reexamine an existing legal doctrine in the light of changed societal conditions. This case presents such an occasion.
The plaintiffs' houses were constructed roughly fifty years ago, and are located in a residential neighborhood. In 1977, the land on which their houses are situated began to sink, large sinkholes appeared, and their houses began to break up. Investigation disclosed that the sinking of their property was due to the activities of defendant, Wade Sand and Gravel Company, which operated a quarry one-half mile north of plaintiffs' homes. In the course of its operations, the quarry, which began operating in 1957, periodically pumps water from the bottom of its pits, and empties it into a nearby creek. This resulted in ground water being leeched from under plaintiffs' land, leaving large underground cavities. Heavy rains then caused water to flow through the empty cavities at an accelerated rate, destroying the structure of the land beneath plaintiffs' homes, and carrying away much subsoil and surface soil.
In 1969, the U.S. Geological Survey began a study of the sinkhole problem in the Roberts Field area, which includes plaintiffs' homes and the quarry. The defendant cooperated in the study and was allegedly familiar with the contents of the report subsequently published. Plaintiffs contend that the study predicted that damage of the type complained of would occur if defendant continued to pump water from its pits. The trial court refused to admit the study into evidence. *Page 901 
The trial court held that a verdict for the defendant was dictated by the principles enunciated in Sloss-Sheffield Steeland Iron Co. v. Wilkes, 231 Ala. 511, 165 So. 764 (1936), andSloss-Sheffield Steel and Iron Co. v. Wilkes, 236 Ala. 173,181 So. 276 (1938). (Sloss I and Sloss II.) Those cases adopted and applied the so-called "American rule" of reasonable use of percolating waters, holding that where a landowner who
 is conducting any sort of operations to which its land is adapted in an ordinary and careful manner, and as a consequence percolating water is drained, affecting the surface owner's water supply, either of that or adjoining land, no liability for his damage exists. But if the waters are drained without a reasonable need to do so, or are willfully or negligently wasted in such operation in a way and manner as that it should have been anticipated to occur, and as a proximate result the damage accrued to the surface owners so affected, including adjoining landowners, there is an actionable claim . . . .
231 Ala. 511 at 518, 165 So. 276.
As to adjoining landowners, "there is no difference between the duty to avoid surface disturbances and that to avoid drainage of percolating water, since the duty of subjacent support is not existent." Id. The trial court directed a verdict for the defendant because it found that plaintiffs had presented no evidence which indicated that the water pumped by the quarry was other than percolating, or that it was pumped unnecessarily or negligently. While we agree with the trial court that Sloss I Sloss II articulate the applicable law and require the result reached below, on reexamination of those cases, we are convinced that they must be overruled.
According to C.J.S.:
 The subject of underground waters is comparatively modern, what has been said to be the first English case having been decided in 1840. From this English source has grown a common-law system of conflicting rules and doctrines, explained by the diversified physical features and characters of the different states, and their peculiarities of climate, soil, density of population, and available water supply.
93 C.J.S. Waters § 86 (1955).
In the eastern United States, the rules as to usage of underground waters have varied according to whether the waters were classified as "percolating water" or as an underground stream. The general rule is that "where a subterranean stream flows in a distinct, permanent, well-known and defined channel, it is governed by the same rules as apply to a natural watercourse on the surface." 93 C.J.S. Waters § 89 (1955). Where there is no definable channel, water is classified as percolating, and a different set of rules has evolved concerning its use. The English rule, which was followed by most of the eastern states in the nineteenth century, was based upon the doctrine "that a man owned from the top of the sky above his land to the center of the earth beneath him." 14Rocky Mountain Mineral Law Institute, "Basic Groundwater Problems," 501, 504. The Restatement (Second) of Torts § 857 (1979), Introductory Note on the Nature of Ground Water and Theories Concerning Its Use, summarizes the doctrine in the following terms:
 The "English rule" . . . gave each landowner complete freedom to withdraw and use ground water and made no attempt to apportion the supply among possessors of overlying land or their grantees. It was based on the premise that ground water is the absolute property of the owner of the freehold, like the rocks, soil and minerals that compose it, so that he is free to withdraw it at will and do with it as he pleases regardless of the effect upon his neighbors. . . . Although framed in property language, the rule was in reality a rule of capture, for a landowner's pump could induce water under the land of his neighbor to flow to his well-water that was in theory the neighbor's property while it remained in place.
Restatement (Second) of Torts § 857 (1979), p. 256. *Page 902 
This concept is clearly in conflict with the venerable doctrine of sic utere tuo ut alienum non laedas, and was quickly modified to the rule of "reasonable use," described in the Restatement thusly:
 The "American rule" was based on the same theory of property and power of capture as the English rule, with the addition of a definite prohibition against waste and of some protection for the wells and springs of adjacent owners. The rule was sometimes called the "rule of reasonable use," but "reasonable" was used in a very special and restricted sense. A waste of water or a wasteful use of water was unreasonable only if it caused harm, and any nonwasteful use of water that caused harm was nevertheless reasonable if it was made on or in connection with the overlying land. . . . The American rule came into being with the invention of the high capacity pump, when cities bought land or easements for well fields in the country and lowered the water table beyond the reach of the domestic wells of neighboring farmers. The rule forced the cities to pay damages to the farmers or provide them with better wells and pumps and was an application of common tort policies of distributing losses and of requiring those who receive the benefits from a harmful activity to pay its costs.
 As between persons using the water on the overlying land, the American rule made no apportionment among users and gave no protection to their wells and springs. If the water was withdrawn for the purpose of making a beneficial use of or on the land from which it was taken, no liability was incurred for resulting harm to an adjoining landowner.
Restatement (Second) of Torts § 857 (1979), pp. 256-257.
It is important to note that the Restatement rules regarding interference with use of water were formulated to deal with situations in which an adjoining landowner's water supply is impaired by a defendant's use or waste of ground water, not, as in Alabama, where adjoining land is itself damaged. Although some jurisdictions have followed Alabama's approach, see e.g.,Finley v. Teeter Stone, Inc., 251 Md. 428, 248 A.2d 106 (1968), a case which the appellee relies on heavily, others have limited application of the reasonable use rule to situations which involve competing uses of water. In a well-reasoned case from Florida, the Supreme Court of that state concluded that where a defendant diverts ground water from adjoining land as an incident to his use of his own land, and does not utilize the water itself, traditional nuisance law is more appropriately applied than rules governing competing uses of percolating waters. The Court discussed the issue in language which could well be applied to the instant case:
 At the outset, it should be noted that we are not here dealing with a problem involving a proprietary competition over the water itself-that is to say, there is no conflict here between the respective rights of persons to make competing proprietary uses of subterranean waters to which they both have access. . . .
 It is pointed out by the annotator at page 1404 of 55 ALR that "Practically all the cases in which this rule of correlative rights or reasonable use has been applied were cases in which percolating water was being extracted from land for the purpose of sale at a distance, for use in supplying water to cities and towns. . . ."
 In the instant case, however, we are concerned with an interference with plaintiffs' use of the spring on their land, caused by conduct of the defendant not involving a competing use of water and in which the effect on the subterranean water is only incidental to the defendant's use of its land. Obviously, then, the rule of "reasonable use," as engrafted upon the old common-law rule of absolute and unqualified ownership of percolating waters, insofar as the proprietary beneficial use of the water is concerned, has no application here where we are concerned with the proprietary use of land, and in which the water is only incidentally affected. Under such circumstances, even at common law, a person *Page 903 
was subject to liability for interference with another's use of water, either for (1) an intentional invasion when his conduct was unreasonable under the circumstances of the particular case, or (2) an unintentional invasion when his conduct was negligent, reckless or ultrahazardous. Restatement of Torts, Vol. IV, Section 849, and Sections 822-840.
Labruzzo v. Atlantic Dredging Constr. Co., 54 So.2d 673, 675, 29 A.L.R.2d 1346, at 1351 (Fla. 1951).
We agree with the reasoning of this case, and conclude that the reasonable use rule was inappropriately applied in Sloss I II. While the Sloss rule may have been acceptable, even beneficial, in an earlier era of lower population density and more primitive technology, it could produce disastrous results today. Carried to its logical extension, it would allow a quarry owner to willfully sink the City of Birmingham with impunity, provided that it was done in furtherance of a legitimate enterprise and that due care was exercised in the pumping. A rule which provides no check on a landowner's ability to utilize his land to the detriment of society cannot be tolerated. The appellee admits that "at some point a balance must be struck between annoyance and inconvenience to plaintiff and the right of defendant to do business," although they omit to specify when the point is reached. Accordingly, we hold that where a plaintiff's use of groundwater, whether it be for consumption or, as here, for support, is interfered with by defendant's diversion of that water, incidental to some use of his own land, the rules of liability developed by the law of nuisance will apply. These are codified in Alabama at Code 1975, Sections 6-5-120 through 6-5-127. We remand the case for further consideration by the trial court consistent with this opinion.
REVERSED AND REMANDED.
JONES, ALMON, EMBRY and BEATTY, JJ., concur.
TORBERT, C.J., and MADDOX, J., dissent.
[1] While the style of this case appears to name two defendants-appellees, the parties agree that the case actually involves only one, Wade Sand and Gravel Co., Inc.